IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

DEMETRIUS L. SPRINGS,
     Plaintiff,

vs.                             Case No.: 3:14cv105/MCR/EMT

W.L. GIELOW, et al.,
     Defendants.
_____/

## REPORT AND RECOMMENDATION

### I.    BACKGROUND

Plaintiff is a prisoner incarcerated in Milton, Florida, at Santa Rosa Correctional Institution ("SRCI"). He commenced this action on February 26, 2014, by filing a document titled "Emergency Injunction" and thereafter a "Motion for Leave to Proceed in Forma [sic]; Request to Proceed as a Pauper Without Prepay [sic] of Cost/Fees" (docs. 1, 4). He also submitted a Prisoner Consent Form and Financial Certificate (doc. 2).

The undersigned reviewed the complaint[1] to determine if Plaintiff's allegations constituted an emergency, and took judicial notice of Plaintiff's litigation history in the federal courts to determine whether he could proceed in forma pauperis ("IFP"). The Prison Litigation Reform Act of 1995, which was enacted on April 26, 1996, provides that a prisoner may not bring a civil action IFP under 28 U.S.C. § 1915:

> if the prisoner has, on 3 or more occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

---

[1] Although Plaintiff did not style any of the documents he filed to commence this action as a "complaint," a review of those documents revealed that Plaintiff alleged a series of civil rights violations at SRCI and claimed that he was under imminent danger of serious bodily injury. The document that most closely resembles a civil rights complaint is the document titled "Emergency Injunction" (doc. 4), and thus the court refers to it as such.

28 U.S.C. § 1915(g).  Plaintiff has had three or more prior prisoner actions dismissed in the federal courts of Florida on the grounds that they were frivolous, malicious, or failed to state a claim.  In this district, the court dismissed Plaintiff's complaint: (1) in Springs v. Knight, et al., Case No. 5:08cv366/SPM/MD, on May 6, 2009, for failure to state a claim, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii); (2) in Springs v. Vosbring, Case No. 5:09cv5/SPM/EMT, on April 9, 2009, as malicious, pursuant to § 1915(e)(2)(B)(i); and (3) in Springs v. Sketo, Case No. 5:09cv155/RS/AK, on July 2, 2009, as frivolous, pursuant to § 1915(e)(2)(B).  In the order of dismissal in Case No. 5:09cv155/RS/AK, the court advised Plaintiff that the dismissal constituted his third "strike."  Id., Order (N.D. Fla. July 2, 2009).  Plaintiff appealed the district court's decision to the United States Court of Appeals for the Eleventh Circuit, Case No. 10-15562, and the Eleventh Circuit dismissed the appeal as frivolous on April 4, 2011.  Id., Mandate (N.D. Fla. Apr. 4, 2011).  Thereafter, also in this district, the court dismissed Plaintiff's complaint in Springs v. McNeil, et al., Case No. 1:10cv81/MMP/AK, on June 15, 2010, based on Plaintiff's status as a three-striker, pursuant to § 1915(g), and the court advised Plaintiff he could not proceed without full prepayment of the filing fee absent allegations that he met the "imminent danger" exception of § 1915(g).

Five months later, Plaintiff filed a motion to intervene and an "Intervenor's Complaint" in Muhammad v. Davis, et al., Case No. 3:10cv705/BJD/JRK, a civil rights case filed by another prisoner in the United States District Court for the Middle District of Florida.  Id., Motion and Intervenor's Complaint (M.D. Fla. Nov. 15, 2010).  The court denied Plaintiff's motion to intervene, struck Plaintiff's "Intervenor Complaint," and dismissed Plaintiff from the case on January 10, 2011.  Id., Order (M.D. Fla. Jan. 10, 2011).  Three months after Plaintiff was dismissed from that case, he filed another case in the Middle District, Springs v. Starling, et al., Case No. 3:11cv336/TJC/MCR.  The court dismissed the case, pursuant to § 1915(g), after directing the Florida Department of Corrections ("FDOC") to respond to Plaintiff's allegations of "imminent danger" and concluding Plaintiff failed to show he was under imminent danger when he filed his complaint.  Id., Order (M.D. Fla. Aug. 26, 2011).  Plaintiff filed four more civil rights cases in the Middle District, Case Nos. 3:11cv1084/RBD/JRK, 3:12cv424/TJC/MCR, 3:13cv1100/TJC/JRK, and 3:14cv183/HES/JBT.  All of those cases were dismissed.  The court dismissed the first three on the ground that Plaintiff failed to show he was entitled to the relief sought in his initial pleadings (he initiated each case with a

motion for injunctive relief), and the court dismissed the fourth case, Case No. 3:14cv183/HES/JBT, on February 19, 2014, pursuant to § 1915(g).

While Plaintiff was filing cases in the Middle District, he resumed filing cases in this district. He filed Springs v. Griffis, et al., Case No. 4:12cv136/SPM/CAS, which was dismissed on May 16, 2012, pursuant to § 1915(g). Additionally, after Plaintiff initiated the instant case on February 27, 2014, he filed more cases in this district, Case Nos. 3:14cv171/MCR/CJK and 3:14cv211/LAC/CJK. Case No. 3:14cv171/MCR/CJK was dismissed on May 1, 2014, pursuant §§ 1915(g) and 1915(e)(2)(B)(i). Id., Order (N.D. Fla. May 1, 2014). Case No. 3:14cv211/LAC/CJK was filed May 3, 2014, and the initial pleading included the same factual allegations (except for one page of facts), which Plaintiff alleged in one of his "emergency" motions for injunctive relief filed in the instant case (doc. 24). Because Case No. 3:14cv211/LAC/CJK presented common questions of fact or law, was initiated by Plaintiff, and involved the same events, it was consolidated with this case, pursuant to Rule 42(a) of the Federal Rules of Civil Procedure.

This history, as well as Plaintiff's allegations of "imminent danger" and labeling the majority of his filings "emergency," suggest that Plaintiff is well aware he is a three-striker and thus cannot be granted IFP status unless he is in imminent danger of serious physical injury.[2]   In Plaintiff's "Motion for Leave to Proceed In Forma [sic]; Request to Proceed as a Pauper Without Prepay [sic] of Cost/Fees," the initial document filed in this case on February 26, 2014, Plaintiff alleged he was "without any 'medical treatment' at all for injuries" he received from "being consistantly [sic] contain/retained/sustained or obtained [sic] from prison guards of Santa Rosa C.I.—beating and gassing Plaintiff because of his history and propensity to file suets[sic]/& grievances (doc. 1 at 1).[3, 4]   He specifically alleged that on December 16, 2013, three prison officials

---

[2] In several of Plaintiff's cases, his initial pleading was not filed on a court-approved complaint form and did not disclose his prior litigation history, which suggests he might have been attempting to conceal his status as a three-striker.

[3] Plaintiff explained that one such suit is a civil rights action he was attempting to file against Officers Johnson and Cooke, prison officials at Union Correctional Institution ("Union C.I.") (doc. 1 at 2). He claimed that Johnson and Cooke "maliciously and sadistically" and without "need and/or provocation" beat and sprayed Plaintiff's face with chemical agents on October 16, 2013, the day they transported him to SRCI, in retaliation for Plaintiff going on a hunger strike at Union C.I. (id.) (incidentally, as will be seen infra, in the instant case Plaintiff alleges he was also sprayed with chemical agents and beaten without cause by SRCI officials on the same day, October 16, 2013, upon his arrival at

at SRCI, namely, Defendants Gielow, Hall, and Smith, "physically beat me and gass[sic]/spray me with chemical agents" after they discovered a § 1983 complaint (involving the officers at Union C.I.) in his property (*id.* at 2). Plaintiff alleged the next day, the same three SRCI officers again "attacked" him after he again attempted to file the § 1983 complaint as well as administrative grievances regarding the incident that occurred the day before (*id.* at 3). In Plaintiff's motion, he requested monetary damages, declaratory relief, and unspecified injunctive relief (*id.* at 3). He labeled his motion an "emergency" and alleged he was in "imminent danger" and feared for his life (*id.* at 5, 7). He requested that the court permit him to proceed IFP (*id.* at 1, 5, 7), presumably because he knew he was a "three striker" under 28 U.S.C. § 1915(g) and, therefore, precluded from proceeding IFP unless he was under imminent danger of serious physical injury. He stated he intended to file a § 1983 complaint, but was awaiting notarial services, and he asked the court to assign a case number and begin processing his request to proceed IFP (*id.* at 7).

Two weeks later, on March 12, 2014, Plaintiff filed his initial pleading, titled "Emergency Injunction: Emergency Trial/Hearing Demand" (which, as previously noted, the court construed as a complaint) (doc. 4). He named thirty (30) prison officials, three identified inmates, and the "Intire [sic] C.M. A/C Prisoners" as Defendants (*id.*). His complaint included factual allegations of ongoing physical and mental abuse by prison officials and inmates, and deprivation of medical treatment, which he described as life threatening (*id.* at 13). He sought temporary and permanent injunctive relief enjoining Defendants from "ongoing abuse" (*id.* at 15–20).

Upon review of the complaint, the undersigned concluded that to aid the court in determining whether Plaintiff was under imminent danger of serious physical injury, and thus entitled to proceed IFP, the FDOC's Office of the General Counsel ("FDOC's counsel") should respond to Plaintiff's allegations of repeated abuse by officers and inmates, and his allegations of denial of medical

---

SRCI).

[4] The page references used in this Report and Recommendation reflect the page numbers as enumerated in the court's electronic docketing system rather than those the parties may have assigned.

treatment (*see* doc. 5).[5]  The court directed FDOC's counsel to file its response within fourteen (14) days of March 19, 2014 (*id.*).  FDOC's counsel did not receive the order until March 24, 2104 (*see* doc. 8).  On April 1, 2014, FDOC's counsel sought an extension of time to file its response, and the court extended the deadline to April 23, 2014 (docs. 14, 15).  Prior to that deadline, Plaintiff filed appeals of the undersigned's orders, an interlocutory appeal with the Eleventh Circuit, several "emergency" motions, an amended complaint (doc. 24), and evidentiary material in support of his allegations.[6]

FDOC's counsel filed a response on April 23, 2014, contesting Plaintiff's allegations of "imminent danger" (doc. 28).[7]  Plaintiff filed a reply and more evidentiary material.  He then initiated the previously-mentioned action in this court against many, if not all, of the same Defendants, Springs v. Gielow, et al., Case No. 3:14cv211/LAC/CJK.   Case No. 3:14cv211/LAC/CJK was consolidated with the instant case on May 8, 2014, and the clerk of court

---

[5] As noted above, the court in the Middle District of Florida proceeded in the same manner in Springs v. Starling, et al., Case No. 3:11cv336/TJC/MCR and ultimately concluded that Plaintiff was not under imminent danger when he filed his complaint and thus dismissed it under § 1915(g).  *Id.*, Order (M.D. Fla. Aug. 26, 2011).

[6] The Eleventh Circuit dismissed the appeal on June 17, 2014 (*see* doc. 60).

[7] In its response, the FDOC contended Plaintiff's assertion that he is not receiving medical care for the injuries allegedly caused by staff and inmate abuse is demonstrably false (doc. 28 at 4).  The FDOC stated that, with the exception of Plaintiff's allegations themselves, there appears to be no record of any incident report or use of force report related to any of the events Plaintiff alleges took place at SRCI.  The FDOC asserted that Plaintiff's medical records, excerpts of which were attached to its Response, demonstrated that notwithstanding Plaintiff's protestations to the contrary, he had been seen in the medical department, including to address issues of gastrointestinal distress and other conditions not relevant to the allegations of use of force and assault in his complaint, during the period of time in which he asserts no medical treatment was provided (*see* doc. 28, exh. A at 1, 2, 7, 9).  The FDOC contended this evidence refuted Plaintiff's allegations that he was being denied access to medical care for injuries allegedly attributable to supposed inmate and staff abuse.

With regard to Plaintiff's allegations of repeated beatings, the FDOC contended these allegations are suspect, because Plaintiff was seen on at least six (6) occasions in the medical department during this time, but no injuries from abuse were observed or treated, and he did not make any allegations of abuse or request any treatment for injuries from physical abuse during those visits (doc. 28 at 5).  Instead, Plaintiff only complained of gas pains and rashes.

Finally, with regard to Plaintiff's allegations that he is unable to file grievances or mail documents to the court because he fears for his life if officers catch him, the FDOC noted that most of Plaintiff's filings bear the institutional stamp and Plaintiff's initials.  Thus, the FDOC contended, his claims that he was forced to use other inmates to complete his filings because he is in imminent danger of harm if prison officials catch him mailing out court documents were also unsupported (doc. 28 at 5–6).

was directed to file all future filings in the instant case (doc. 35). Plaintiff filed a motion to amend and a proposed second amended pleading (docs. 38, 39). In light of the consolidation, the undersigned granted Plaintiff's motion to amend (doc. 37). Therefore, the operative pleading in this case is Plaintiff's Second Amended Complaint (doc. 39). As Defendants, Plaintiff names forty-two (42) prison officials, four (4) identified inmates, and the entire population of inmates in C-dorm of the Close Management housing unit at SRCI (*id.*).

Upon review of the numerous documents filed by Plaintiff, as well as the response filed by counsel for the FDOC, the court determined that an evidentiary hearing was necessary to evaluate the credibility of Plaintiff's allegations. The court first held a telephonic scheduling conference with Plaintiff and FDOC's counsel to set a date for the evidentiary hearing, establish the scope of any pre-hearing discovery, and determine the name and number of the parties' witnesses. At this telephonic conference, held on May 15, 2014, the court notified the parties that the time frame of the events alleged in the Second Amended Complaint would be deemed the time frame relevant to the issue of whether Plaintiff qualified for IFP status under the "imminent danger" exception, because allegations regarding events that occurred after May 7, 2014 (the date of the most recent incident alleged in the Second Amended Complaint), were too far removed from February 26, 2014, the date Plaintiff commenced this case.[8] During the telephonic conference Plaintiff—after being placed under oath—supplemented or clarified the allegations in his Second Amended Complaint. He also identified approximately ten inmate witnesses he wished to call at the evidentiary hearing, and FDOC's counsel indicated they wished to call numerous SRCI correctional officers, supervisory officials, and medical personnel, as well as an inspector with the Office of the Inspector General ("IG") who had previously investigated some of the allegations made by Plaintiff in this action.[9]

---

[8] FDOC's counsel asked the court to consider only those allegations of the Second Amended Complaint that relate to the time period prior to February 26, 2014, the date Plaintiff initiated this action (doc. 49 (transcript of telephonic conference) at 5). The court acknowledged that historically its practice had been to do so, but in light of the court's decision in Smith v. Clemons, 465 F. App'x 835 (11th Cir. 2012) (unpublished), and in an effort to give Plaintiff some leeway, the court determined it should consider a larger time frame. The court's decision to widen the time frame was also influenced by the shocking and disturbing nature of Plaintiff's allegations.

[9] David W. Grimes, an attorney for the FDOC, indicated during the telephonic conference that due to the "seriousness of the nature of [Plaintiff's] allegations," he provided a copy of the complaint (doc. 4) to the IG's office "so they could review it and take whatever action they wanted to" (doc. 49 at 60). He explained that the IG's office and

In light of the anticipated need for the testimony of a large number of inmate witnesses (all of whom were close management inmates) and SRCI staff members—and consistent with the provisions of 42 U.S.C. 1997e(f)(2) (providing that in any prisoner § 1983 action, pre-trial proceedings may be conducted at the facility in which the prisoner is confined)—the undersigned determined that the hearing should occur at SRCI and scheduled it there for June 23 and June 24, 2014.

Thereafter, the court—with the assistance of FDOC's counsel—ensured that the witnesses identified by Plaintiff during the telephonic conference would be made available to testify. Additionally, shortly before the evidentiary hearing, the FDOC filed a final witness list (doc. 65). This list included the inmate witnesses previously identified by Plaintiff; it also included fourteen potential witnesses for the FDOC.  Two additional witnesses for Plaintiff were later added to the roster (*see* docs. 46, 54).  The evidentiary hearing commenced as scheduled at 9:00 a.m. on June 23, 2014, and concluded at the close of business on June 24, 2014.  Plaintiff was placed under oath each day prior to offering any statements related to his allegations and, as he did before during the telephonic conference, he supplemented or clarified his allegations under oath on multiple occasions during the two-day evidentiary hearing (and even added some allegations that were not apparent from the complaint but which Plaintiff suggested were indeed a part of the complaint).

Having fully considered Plaintiff's allegations and the evidence adduced at the lengthy evidentiary hearing, the undersigned is convinced that Plaintiff is not now—and was not at the time he commenced this action—under imminent danger of serious physical injury; nor is he at risk for mistreatment or in danger of "more serious afflictions" in the future.  Smith, 465 F. App'x. at 836 (citing Brown v. Johnson, 387 F.3d. 1344, 1350 (11th Cir. 2004)).  Thus, as Plaintiff failed to submit the filing fee at the time he initiated this action, and he is not entitled to proceed IFP, the undersigned recommends that this action be immediately dismissed and all pending motions denied as moot.  Additionally, as the undersigned is convinced that Plaintiff has repeatedly perjured himself

---

his office (the Office of the Attorney General) are separate, and if his office receives a complaint such as Plaintiff's that has not yet been presented to the IG's office, his office forwards the complaint to the IG's office "to determine what, if anything, they want to do" (*id.*).  Thus, he explained, he did not ask the IG's office to investigate Plaintiff's allegations (*id.*).  Mr. Grimes' representations are substantiated by documents introduced at the evidentiary hearing (namely, FDOC's exhibit 10, a report and related materials compiled by the IG's office, including an email from Mr. Grimes to the IG's office, which email prompted the IG's inquiry into Plaintiff's allegations).

in this case, both in his written submissions and during his live testimony before the court, the undersigned further recommends that this matter be referred to the United States Attorney's Office for the Northern District of Florida, which office should be directed to consider whether to pursue perjury charges against Plaintiff.

## II.    PLAINTIFF'S ALLEGATIONS

Although Plaintiff has filed numerous documents in this case, and submitted some as having been "sworn to" (*see, e.g.*, doc. 29), the Second Amended Complaint is the operative complaint; thus, the court will largely limit its summary of the written allegations of record to Plaintiff's sworn allegations in that complaint (doc. 39 (sworn to at p. 42)).  The court will also identify and consider sworn verbal statements made by Plaintiff at both the telephonic conference and the evidentiary hearing.  For ease of reference, the court will refer to the allegations of the Second Amended Complaint as "c. at [page number]"; Plaintiff's testimony at the telephonic conference (transcript at doc. 49) as "tc. at [page number]," and his testimony at the evidentiary hearing (transcript at docs. 80 (day one) & 81 (day 2) as "eh. (day 1) at [page number]" and "eh. (day 2) at [page number]."

### A.    Allegations in the Second Amended Complaint

Plaintiff alleges that on October 16, 2013, he arrived at SRCI as a Transitional Care Unit ("TCU") patient from the mental health unit at Union C.I. (c. at 6).  Plaintiff alleges he had refused all meals at Union C.I. for fifteen (15) consecutive days, which rendered his health "not in good standing" upon his arrival at SRCI  (*id.*).  Plaintiff alleges when he arrived at SRCI, the transport officers from Union C.I. advised Defendant Sgt. Brock and another officer that Plaintiff was recalcitrant and disorderly, and "need[ed] his ass kicked" (*id.* at 7).  Plaintiff alleges he attempted to tell Sgt. Brock the "true events," but she told him, "Springs, you just shut your goddamn mouth while you still got some damned teeth—you understand where you're at—do you not understand, inmate?" (*id.*).  Plaintiff alleges Defendants Brock, Major Gray, and Ofc. Corbin, then sprayed his body with chemical agents and beat him without need or provocation while he was restrained (*id.* at 8–9).  He alleges that as a result, he suffered "suffocation," difficulty breathing for many hours, and severe physical pain for several days (*id.* at 8).

Plaintiff next alleges that from October 16, 2013 through December 7, 2013, he was placed in the mental health dormitory, cell Q-4-207, without any property or medical attention (*id.*).  He

states that on December 7, 2013, Defendants Warden Comerford, Assistant Warden Courtney, and Assistant Warden Booker ordered him to stop attempting to access sick call or the medical department, and on December 11, 2013, he was transferred to the Close Management Special Housing Unit ("C.M.S.H.U.") (*id.* at 10). He claims he was in severe pain from "ongoing beatings" by SRCI prison officials, which caused contusions to the top of his forehead, a "spranged" neck and "sprang" knee joints, a broken little toe on his left foot, swollen ribs, "suffocation," and cuts on his body (*id.* at 10). He again alleges he was not allowed to receive medical treatment for these injuries (*id.*). Plaintiff further alleges that upon his arrival at C.M.S.H.U., Defendants Lt. Gielow, Ofc. Hall, and Ofc. Smith mentioned the episodes of beatings and gassings which Plaintiff had suffered, and asked him if he was going to write any more grievances or file any more lawsuits against staff (*id.* at 11). Plaintiff alleges within thirty (30) minutes, Gielow, Hall, and Smith searched his property and uncovered a § 1983 complaint against Union C.I. officials, as well as grievances (*id.*). Plaintiff alleges between 12:57 p.m. and 2:00 p.m. that day, Gielow, Hall, and Smith physically beat him, sprayed him with chemical agents, and destroyed the civil rights complaint in retaliation for his attempting to file it (c. at 11; *see also* doc. 1 at 2). Similarly, Plaintiff alleges that on December 16 or 17, 2013, Gielow, Hall, and Smith again caught him attempting to file grievances and a civil rights complaint (in which he alleged life-threatening injuries of bleeding out of his anus and suffering from suffocation), and gassed and beat him, after speaking with Major Gray (c. at 11; *see also* doc. 1 at 3). Plaintiff also alleges two inmate Defendants, Clarance Flowers and "Cedric Gennerett," beat him for one hour or more on December 11, 12, 13, 14, 16, 17, 18, 19, and 20, 2013, and that Gielow, Hall, and Smith rewarded these inmates for beating Plaintiff by giving them extra food trays and contraband items (*see* c. at 12).

Continuing, Plaintiff alleges that on February 6, 2014, Ofc. Hall picked him up and body-slammed him into the pavement of the recreation yard (*id.* at 25). He alleges there were no cameras, but two nurses observed him limp as he attempted to walk (*id.*). He alleges he was denied medical treatment for his injuries (*id.*).

Plaintiff also alleges he was deprived of food and medical attention during the 7:00 a.m. to 5:00 p.m. shift, from December 20, 2013 to February 26, 2014 (c. at 12). And he alleges that on January 27, 2014, and February 20, 2014, prison officials falsely reported that he held up a

dangerous weapon inside his cell to justify use of the "Rapid Response Riot—Use of Deadly Force Strike Team" (*id.* at 13).  He alleges Defendants Warden Comerford, Assistant Warden Booker, and Col. Khloejay authorized the use of "deadly force" (*id.*).  Plaintiff alleges Defendants destroyed all audio and video recordings of the use of "deadly force" on those occasions (*id.*).

Plaintiff further alleges that on March 18, 2014, Defendant Ms. D.J. Locke, a prison official in the SRCI mail room, received a request for postage from Inmate Jerome Davis, to send an accompanying sealed envelope to the United States Attorney's Office (c. at 14–15).  Plaintiff states the envelope contained a petition signed by Inmate Davis, Plaintiff, Inmate James Staton, and another inmate, requesting the filing of criminal charges against several members of the SRCI staff (*id.*).  Plaintiff alleges Ms. Locke illegally read the legal mail, filed a false disciplinary report ("DR"), and gave Defendants Ms. M.L. Deidrick and Lt. Enfinger copies of Plaintiff's pleadings in the instant case and copies of the petition to the U.S. Attorney's Office (*id.*).  Plaintiff states that on March 26 and March 27, 2014, Deidrick and Enfinger visited his cell and Inmate Staton's cell and threatened that Plaintiff and Inmates Staton and Davis "will never see our futures alive, let alone a release back to open inmate prison populations" (*id.* at 15).  Plaintiff alleges at the disciplinary hearing on March 27, 2014, over which Deidrick and Enfinger presided, Deidrick told Plaintiff that he was "going to really get it where it kills most" (*id.*).

Plaintiff alleges that on March 24, 2014, members of the Institutional Classification Team ("ICT"), Defendants Diedrick, Enfinger, Ofc. Engstrom, Lt. McKranie, Comerford, Ofc. Estepp, Ofc. Demand, Courtney, Ms. A. Beasley, Ms. M. Neal, and Gray, ordered him to appear at a protective management special review hearing to review a request he had submitted for protection from other inmates (c. at 17).  Plaintiff alleges during his escort to the ICT hearing, Defendants Inmate Flowers and Inmate Marcus Dewberry yelled, "Hey Springs, we gonna kill your ass when we run down on yo' ass.  Teach yo' ass about all that police shit you doing.  Snitch ass Nigga!" (*id.*).  Plaintiff alleges the officers who escorted him to the ICT hearing, Defendants Ofc. Enkertin, Estepp, and "Estraum" (rank unknown), responded to Inmates Flowers and Dewberry, "Ya'll hurry on over to C.M. level 3 in C-dorm and we will personally see to it that ya'll are look [sic] after really good after ya'll hand Springs's ass to him on a state tray.  We promise ya'll good looking out [sic].  We're tired of this lil' monkey's shit already.  He's always riding the 'bitch box' with his damn writ

writing" (*id.* at 18).  Plaintiff alleges he told the ICT about the comments made by the inmates and officers during his escort, and he pointed out the "noticeable wounds and scars" caused by the alleged abuse from staff and inmates, but the ICT denied his requests for protection from staff and inmates and denied a "medical treatment regimen" (*id.* at 18–19).  Plaintiff alleges the ICT had copies of his pleadings and petition to the U.S. Attorney, which were provided to them by Ms. Locke (*id.*).

Plaintiff alleges also on March 27, 2014, in the "E.R. Specialist room for medical events," Defendant Ofc. Kasanovich "palm-punched" him on the right side of his jaw while he was in full restraints, breaking 70% of a tooth and cutting the inside of his jaw (c. at 16, 21).  Plaintiff alleges Kasanovich stated, "Nothing personal Springs.  You should be glad I took it easy on Ya, considering what's coming to your ass next.  You should've trashed all them damn complaints" (*id.*).  Plaintiff alleges he was not allowed to seek medical treatment for the injuries to his mouth (*id.*).

Plaintiff alleges on May 1, 2014, at 9:00 a.m., Defendants McKranie, Engstrom, Ofc. Long, and Ofc. Figuerez approached his cell, and McKranie and Engstrom stated, "Inmate Springs, do you want to come out to sick-call.  You're on the list.  Springs if you come here telling the nurses anythings [sic] about damn injuries you [sic] getting your ass tore first of all, you understand me?" (c. at 21–22).  Plaintiff alleges their statements caused him to "fear for [his] life," so he declined medical sick-call callout (*id.* at 22).  He alleges Sgt. McKranie responded, "10-4 Springs, I thought you'd see things our way.  You learn real quick, don't Ya?" (*id.*).  Plaintiff alleges that ten minutes later, at 9:10 a.m., the same officers returned to his cell (*id.*).  He alleges McKranie stated, "Springs, are you coming out to see the inspector investigator?  Springs, if you come out then I'm gonna fuck your shit up bad.  I mean worst [sic] than your options were before, worst [sic] than all that's happen [sic] to you already.  We're gonna tear you a new ass Springs.  Are you coming out or no [sic]?" (*id.*).  Plaintiff alleges he responded that he wanted to interview with the inspector (*id.*).  He alleges the inspector was at his cell front, and he told the inspector about the threats made by McKranie and Engstrom (*id.*).  Plaintiff alleges he submitted to restraints, in order to be transported to his meeting with the inspector, and McKranie and Engstrom grabbed his right wrist and pulled his right arm through the food flap of his cell door and twisted his wrist backward resulting in injury to his right arm, specifically, "retearing [sic] his tendons, muscle reconstruction, and reconstruction of tissues"

(*id.* at 21–22).  Plaintiff alleges the institutional inspector was present when this occurred (*id.*).  He further alleges that during his interview with the inspector, he told the inspector he required medical attention, but the inspector did nothing (*id.* at 22).  Plaintiff states that while he was away from his cell interviewing with the inspector, McKranie, Engstrom, Long, and Figuerez stripped him of all of his property, including his legal work, mattress, pillows, linens, clothing, and hygiene and "comfort" items, and destroyed documents from this court case (*id.* at 22–23).  He also claims they planted a sewing needle in his pillow and destroyed his pillow case, and then issued him a DR for possessing a weapon and destroying State property (*id.*).  Finally, Plaintiff alleges that on May 7, 2014, Defendants Gray, Courtney, and Neal retaliated against him by placing him back on the most restrictive custody level, Close Management I (*id.*).

Plaintiff asserts FDOC Secretary Michael D. Crews and FDOC Inspector General Jeff Beasley have not done anything, despite having received this court's order directing the FDOC to respond to Plaintiff's allegations of imminent physical injury (c. at 24).

Plaintiff alleges he suffers "serious physical injury" as a result of Defendants' present and ongoing beatings, "non-stop" gassings with chemical agents, and uses of "deadly force" (doc. 39 at 24).  He alleges:

> As a result, Springs is constantly bleeding and passing fluids unknown to Plaintiff at stool times from his internals.  More specifically, Springs's gastric-bowels pained severely then issued blood (thick and dark) as Springs gets hit with punch and kick, blows by guards in B-dorm hallway sallyport and C-dorm sallyport hall, as narrated in the body of his complaint, Springs (Plaintiff) never receives any medical treatment or medical exploratory x-ray test to learn what has ruptured inside him.  It's scary.  Plaintiff is in fear for his life.  No medical administery [sic] to remedy injuries!!!!!

(c. at 25).  He also alleges he continues to suffer anxiety, stress, depression, mental anguish, and misery (*id.* at 8).

B.      Plaintiff's Supplemental Testimony Offered During the Telephonic Conference

During the telephonic conference, Plaintiff acknowledged—after being placed under oath (*see* tc. at 13)—that he claimed in the complaint that he was "severely starved" during the 7:00 a.m. to 5:00 p.m. shift for more than two months, from December 20, 2013, through February 27, 2014 (c. at 12; tc. at 19).  The court asked Plaintiff if he meant that he received no meals during that shift during the entire time frame alleged.  Plaintiff explained that two meals (lunch and dinner) are

served during the 7:00 a.m. to 5:00 p.m. shift, and that on each and every day between December 20, 2013 and February 27, 2014, he was deprived of at least one meal, that on some days he was deprived of both lunch and dinner, and that on at least four occasions he was deprived of both meals for three days in a row (tc. at 20–24).  While unclear, Plaintiff appears to have also testified that on some of the occasions when he allegedly was denied a meal, he was not denied a full meal but rather was given an "air tray," which largely consists of trash (e.g., empty food containers), such that a video of the meal delivery would appear to depict the delivery of a full meal, but in actuality either no meal or only a partial meal was delivered to him (*see id.*).

Plaintiff also confirmed, as he had alleged in his complaint, that the "Rapid Response Riot Team" had been deployed on two occasions, January 27, 2014, and February 20, 2014 (tc. at 39–41). Further, he testified that the inspector from the IG's office, who came to SRCI on May 1, 2014, "was not righteous in his job at all" (*id*. at 53).  For instance, Plaintiff testified, the inspector "dictated" what Plaintiff could say before he turned on the recorder and thus "limited the scope" of what Plaintiff was able to state during his recorded interview (*id*. at 53–54).

Plaintiff also complained at the telephonic hearing that he had been "trying to get to medical" because he was in pain and in need of medical attention for his injuries, but his requests had been denied (tc. at 57–58).  He further stated that his SRCI-issued clothing was not clean and he was "breaking out from it" (*id*. at 63).  Upon hearing Plaintiff's complaints, FDOC's counsel arranged for Plaintiff to be seen by Steven Schwartz, a SRCI physician, the following day (*see id*. at 61, 63–64; eh. (day 2) at 90–119).

Additionally, as previously noted, Plaintiff testified that various inmates would substantiate his allegations, including the following inmates:

(1)     Inmate Herman Claude, who would testify that from early March 2014, forward, Plaintiff was deprived of meals, deprived of his legal paperwork, and placed on strip in retaliation for filing grievances and litigating this case (*see* tc. at 26–29);

(2)     Inmate Claude's roommate (later determined to be Inmate Terrance Carter (*see* doc. 65)), who would provide the same testimony as Claude regarding Plaintiff's meals, legal paperwork, and placement on strip (tc. at 30);

(3)     Inmate Jerome Davis, who would testify that Defendants "starved" Plaintiff and "spoke out loud on the wing concerning the fact that [Plaintiff] had filed these cases against them, and that [Plaintiff] was the writ writer," and who would "clearly testify" regarding "threats against [Plaintiff's] life, how [Defendants] would F [him] up, [and] stuff like that" (*id.* at 14–15);

(4)     Inmate Corey Samuel, who would provide testimony "concerning [Plaintiff's] missed meals" between approximately February 20 and March 2014, and Plaintiff's placement on "strip cell, strip" (*id.* at 18, 25–26);

(5)     Inmate James Staton, who would testify "about [Plaintiff] being starved" and retaliated against (i.e., receiving a DR because he provided witness statements for other inmates' use in disciplinary proceedings or assisted other inmates in similar endeavors), and who would testify that he (Staton) was issued a false DR for doing the same for Plaintiff (*see id.* at 16–17);

(6)     An inmate Plaintiff knew as "John," who was housed in C-Dorm in cell number 3221 (later determined to be Inmate John Clay (*see* doc. 65)) and would offer testimony about the events that occurred on May 1, 2014, the day the inspector came to SRCI (tc. at 32); and

(7)     An inmate Plaintiff knew as "Cloud" (later determined to be Inmate Edward Hines (*see* doc. 65)), who would also testify about the events that occurred when the inspector came to SRCI to interview Plaintiff (e.g., officers pulling Plaintiff's hand through the door flap and injuring it, planting a weapon in Plaintiff's cell to justify stripping it, and generally retaliating against Plaintiff) (tc. at 31).

The court then mentioned Inmates Clarance Flowers and Cedric Gennerett, since Plaintiff alleged he had repeatedly been beaten by them.  With respect to Flowers, Plaintiff testified that he was the inmate he "listed that [he] needed protection from," because SRCI staff had "basically gave him an offer to take care of [Plaintiff] for them," although Plaintiff stated that Inmate Flowers would not testify at the evidentiary hearing because he was afraid and/or angry at Plaintiff because Plaintiff filed a grievance and included allegations with respect to Flowers in the grievance and in the complaint filed in this action (tc. at 33–34).  With respect to Inmate Gennerett, FDOC's counsel indicated that they could not find an inmate in the FDOC's database with that name, and Plaintiff

stated he was not sure how the inmate's name was spelled and that he had done his best to identify him.[10]

## III.   EVIDENCE ADDUCED AT THE EVIDENTIARY HEARING

### A.   Plaintiff's Case-in-Chief (the testimony of nine inmate witnesses).

#### (1)   Inmate Herman Claude (*see* eh. (day 1) at 66–105)

Inmate Claude testified that he was housed near Plaintiff from approximately February through April 2014 in C-Dorm, a close management ("CM") dorm, and that both he and Plaintiff were CM inmates.  He testified he saw Ofc. Kasanovich deprive Plaintiff of a lunch meal three times but not on consecutive days.  On another occasion, he saw an officer give Plaintiff a breakfast tray that was "messed up," meaning it contained oatmeal and one coffee cake but was supposed to have two coffee cakes (thus, Inmate Claude confirmed, Plaintiff received a breakfast meal but not a full meal).  Inmate Claude testified that after being deprived of a coffee cake Plaintiff demanded to see a higher-ranking officer, and when that officer arrived, he threatened to put something on Plaintiff's meal tray that would make him "defecate for seven days straight."  Thereafter, Plaintiff was denied a total of seven to eight breakfast meals, but not on consecutive days, although Plaintiff could have been denied a breakfast meal on two—but no more than three—consecutive days.  In sum, factoring in both breakfast meals and the lunch meals denied by Kasanovich, Inmate Claude estimated that Plaintiff was denied a total of eleven meals, on separate days, between February and April 2014. Plaintiff was, however, never denied a dinner meal according to Inmate Claude.

With respect to the inspector's visit on May 1, 2014, Inmate Claude first testified that Plaintiff wanted to see a nurse or go to medical prior to the inspector's arrival, but he was "bucked" (meaning, he was not permitted to do so).  When asked whether he saw Plaintiff leave his cell to meet with the inspector, and whether this was eventful or uneventful, Inmate Claude responded, "Yes, ma'am, I'm right next door, I could look through the crack. . . . .  No, nothing major happened. He just cuffed up and came out."  Inmate Claude further testified that while Plaintiff was being interviewed by the inspector, Sgt. McCranie and Ofc. Engerton (phonetic) confiscated a ripped pillow (and other property) from Plaintiff's cell, after which Plaintiff was placed on strip, which

---

[10] Testimony at the evidentiary hearing revealed that the inmate's name is Cedric Jenrette.

meant—for Plaintiff or any other inmate placed on strip—that everything was taken from his cell, including clothing (other than boxer shorts), bedding and pillows, as well as Plaintiff's (or any other inmate's) mat, blues, towel, towel cloth, shoes, and legal paperwork.  Inmate Claude explained that the officers apparently damaged Plaintiff's pillow, so they could charge Plaintiff with destruction of property and justify placing him on strip.  Inmate Claude also testified he never saw any physical injuries on Plaintiff.

Finally, Inmate Claude testified that he heard Sgt. McCranie threaten Inmate Edward Hines and tell Inmate Hines (in so many words) that if he testified for Plaintiff he would suffer consequences, such as being issued a DR for lying to staff or placed on a more restrictive CM level. Inmate Claude also suggested—although his testimony is not entirely clear—that Inmate Corey Samuel was threatened in a similar manner, but he did not personally witness the threat as he had with  Inmate Hines.  He stated that he, too, was intimidated by officers, on June 6, 2014, the day he was deposed in this case, as they threatened in a manner similar to Hines.  He admitted, however, that he had in fact suffered no adverse consequences between June 6, the day of his deposition, and June 23, 2014, the day of his testimony at the evidentiary hearing (although he then added that Sgt. McCranie told him "the fire [was] coming down" after the conclusion of the instant case).

(2)      Inmate Terrance Carter (*see* eh. (day 1) at 143–153)

Inmate Carter testified he was housed in the same dormitory as Plaintiff, the B-Dorm, from approximately late December 2013 through the end of March 2014.  Thereafter, he was housed in the same dormitory as Plaintiff, the C-Dorm, from the end of March through approximately mid-June 2014 (in mid-June, Inmate Carter was moved and placed on CM-1, the most restrictive CM level, because he received a DR).  Inmate Carter testified he did not see Plaintiff placed on strip or deprived of any meals, possessions, or legal paperwork in either dormitory.  He did, however, hear Ofc. Burke "threaten" Plaintiff in the B-Dorm by stating to inmates in that dorm, "will someone please shut Mr. Springs up" or words to that effect.  Inmate Carter testified he had no knowledge

or information suggesting that any inmate harmed Plaintiff or otherwise responded to Burke's comment.[11]

(3)     Inmate Jerome Davis (*see* eh. (day 1) at 117–143)

Inmate Davis testified that from approximately February through April 2014, he and Plaintiff were housed in the same dorm, the C-Dorm, which is a dorm where CM inmates are housed, and that his testimony concerned events occurring within this approximate time frame. Inmate Davis stated he was housed on a floor above the floor on which Plaintiff was housed, but he could see Plaintiff. He testified that "15 times or better [] in the course of a short period of maybe 45 days, 30 to 45 days," Plaintiff was provided only one meal a day, but the deprivation occurred on consecutive days only once, when it occurred on four consecutive days. Inmate Davis additionally testified that he heard Ofc. Kasanovich, also known as "Psycho," threaten Plaintiff. When asked to state the precise threat, Inmate Davis testified: "[Kasanovich would] say, 'I'll be back later, we'll talk later' this is his favorite comment 'we'll talk later.'" When pressed further, and asked to explain how this was a threat to Plaintiff, Inmate Davis stated it pertained to the denial of a meal and explained: "He [Kasanovich] asked Mr. Springs if he's going to eat. Okay. Mr. Springs is trying to get his tray. All right. He never opens the flap for Mr. Springs to get his tray. And he says we'll talk later." Inmate Davis additionally testified that on one occasion he saw Ofc. Kasanovich and another officer slam Plaintiff's hand in the door flap and joke about the fact that Plaintiff's hand was broken. He further claimed he heard Plaintiff ask for medical attention for his hand, but Plaintiff's request was denied. Continuing, Inmate Davis testified that Plaintiff was also threatened by Ofc. Kasanovich as follows: "[I]f he continues writing grievances, he won't have a pen or a paper to write with."

With respect to the gassing incidents alleged by Plaintiff, Inmate Davis testified he personally observed Plaintiff being sprayed with chemical agents "four times at least," on four

---

[11] At the conclusion of Inmate Carter's testimony, Plaintiff indicated that Carter did not appear to be the same person Plaintiff described at the telephonic conference. Thus, at Plaintiff's request, the court asked Inmate Carter some follow-up questions, during which he indicated that he was not sure whether he could see Plaintiff's cell when they were both in the C-Dorm. As an aside, the court found that even if Inmate Carter had been misidentified, there was no need to hear from the inmate Plaintiff intended to identify, as that inmate's proposed testimony (regarding placement on strip and deprivation of meals and legal paperwork) would be cumulative.

separate occasions, but "probably more [times] than that." He also testified that the (unidentified) officers who sprayed Plaintiff did so for far longer than was authorized or necessary. For example, he explained, Plaintiff was sprayed until the can of chemical agents "broke" or sprayed for ten to fifteen seconds without interruption, which far exceeds the "three, one-second bursts" protocol.

(4)     Inmate Corey Samuel (*see* eh. (day 1 a.m.) at 93–102)

Inmate Samuel testified he was housed in the same dorm with Plaintiff for a period of time commencing in approximately March or April of 2014, in a cell above Plaintiff's cell. He stated he was afraid to testify for Plaintiff, both when FDOC's counsel attempted to depose him (and thus he refused to be deposed) and at the evidentiary hearing, because he previously had a tooth knocked out by a SRCI officer and he was afraid that if he testified he would be injured again. He also noted he was hoping to "get off CM [2]," and was up for review with respect to his CM classification in August 2014 and he did not want to worsen his chances of obtaining a less-restrictive classification by testifying for Plaintiff. He claimed to be afraid of retaliation by approximately 15 of the 42-named Defendants in Plaintiff's complaint, although he admitted that he pursued a civil rights action against many of these same Defendants, and their alleged conduct or threats of retaliation did not deter him from doing so.

(5)     Inmate James Staton (*see* eh. (day 1) at 42–66)

Inmate Staton testified he heard that in May 2014 Plaintiff was bypassed on meals, but he never personally observed Plaintiff being deprived a meal. With respect to alleged retaliation, Inmate Staton's testimony was unclear. He stated that Plaintiff helped him write a grievance, in which he (Staton) alleged he was being harassed by SRCI officers, and that afterward he (Staton) was retaliated against by various officers who destroyed his cell and scattered his legal paperwork throughout it. He also claimed that he (Staton) was retaliated against by being moved into a cell with a known rapist; he explained, "they stuck me in there [the rapist's cell] even though Springs wrote the grievance." He also testified that he assisted Plaintiff at a DR hearing, and that he himself was issued a DR. It is unclear from his testimony whether the officers' alleged retaliation against Inmate Staton was motivated by his own behavior or due to his assisting Plaintiff. Either way, Inmate Staton did not testify that he or Plaintiff was actually assaulted or harmed by an officer or by another inmate. And specifically with respect to Plaintiff, Inmate Staton testified that the alleged

retaliation consisted of meal deprivation.  Finally, Inmate Staton testified he heard Sgt. McCranie tell Plaintiff that he was going "to get" him and/or that he was "fixing to get [him] because [he was] a witness for Mr. Staton."  Again, however, Inmate Staton offered no testimony suggesting that Sgt. McCranie carried out his threat.

(6)      Inmate John Clay (*see* eh. (day 1) at 24–42)

Inmate Clay initially testified with respect to the issue of meal deprivation(s) and stated he had seen Plaintiff deprived of lunch and dinner, but the longest deprivation he observed was for two consecutive days.  With respect to the events of May 1, 2014, he testified that when Plaintiff was being cuffed and removed from his cell for his interview with the inspector, he did not hear Plaintiff cry out in pain or hear any sounds consistent with Plaintiff being injured.  He acknowledged that the normal procedure for any inmate who is taken from a CM cell to go to medical or for some other reason is to be handcuffed behind his back.  He also testified that while Plaintiff was meeting with the inspector, officers entered Plaintiff's cell and took all of his property, and that when Plaintiff was ultimately returned to his cell he was wearing only boxer shorts.  Inmate Clay testified that Plaintiff demanded to see the captain or the inspector, and that the inspector then came to Plaintiff's cell, looked inside, and observed that all of Plaintiff's property had been removed.  According to Inmate Clay, Plaintiff kept insisting that he wanted to see the captain and go to medical; he also heard Plaintiff "holler" and heard officers telling Plaintiff he would be gassed, to which Plaintiff allegedly responded, "y'all gas me whatever, I want to see the captain."

(7)      Inmate Edward Hines (*see* eh. (day 1) at 181–200)

Inmate Hines testified that on May 1, 2014, the day the inspector came to SRCI, he was housed in cell number 3118, which was directly across from Plaintiff's cell (# 3107 (*see* doc. 68, attached FDOC exh. 3 at 9)), and thus he could see the interior of Plaintiff's cell.  He testified that on May 1, however, he was sleeping at the time of the relevant events and thus did not see anything.  He stated that his prior statements to the contrary were untrue (e.g., that he saw the officers searching Plaintiff's cell while he was being interviewed by the inspector) (*see* exh. 3, transcript of

Mr. Hines' deposition taken June 6, 2014), and that he made the prior statements because he was mad at Sgt. McCranie because McCranie gave him a DR.[12]

(8)     Inmate Joseph Perry (*see* eh. (day 1) at 16–24)

Plaintiff did not identify Inmate Joseph Perry as a potential witness during the telephonic conference, but he later requested that he be permitted to testify at the evidentiary hearing, and the court permitted the testimony (*see* docs. 46, 54).   In pertinent part, Inmate Perry testified he overheard Sgt. McCranie tell Plaintiff, upon McCranie's being served with a subpoena for the evidentiary hearing, "keep it up," and "before it's all over with they [McCranie and other officers] are going to kill [Plaintiff]."   He also claimed to have heard two officers, both with the surname "Burt," tell Plaintiff "that nothing was going to come of the suit he filed and that they were going to get him."   He further claimed to have heard "Officer E" tell Plaintiff he was "going to fuck him up" and heard other officers refer to Plaintiff as a snitch because of the instant lawsuit.   Lastly, Inmate Perry noted that the threats he heard were made some time on or after mid-May 2014.

(9)     Alfonso Lee (*see* eh. (day 1) at 153–181)

As with Inmate Perry, Plaintiff did not identify Inmate Lee as a potential witness during the telephonic hearing, but he later requested that Lee be permitted to testify at the evidentiary hearing, and the court permitted the testimony (*see* docs. 46, 54).   Inmate Lee testified he and Plaintiff were cellmates for one to two months in the C-Dorm, commencing in (approximately) February 2014. He stated that their cell number was 2105 or "25 or 07."[13]   He testified that on three separate occasions Ofc. Engstrom asked him to beat or injure Plaintiff (using terms such as "take care of [Plaintiff]," "handle Springs," and "mess [him] up").   He further testified he (Lee) was threatened that he would be harmed if he did not harm Plaintiff.  He testified he was subsequently assaulted by

---

[12] To the extent Plaintiff suggests that Inmate Hines recanted his testimony because he was afraid to testify or otherwise assist Plaintiff in the prosecution of this case, the court notes that Hines was specifically asked at the beginning of his deposition, taken by FDOC's counsel on June 6, 2014, "Is there any reason that you cannot speak truthfully, honestly, and openly today?" and Hines responded "No, Sir." (*See* doc. 68, attached FDOC exh. 3 (Hines' deposition transcript) at 5, 21–24), although he later stated he would not provide any additional testimony unless FDOC's counsel agreed to protect him against the retaliation he expected due to his testifying (*see id.* at 18–20).  Plaintiff then suggested that FDOC's counsel could have Inmate Hines transferred "if there's an issue," although counsel explained that they could not transfer Hines or order or arrange such a transfer (*see id.* at 20–21).

[13] Plaintiff subsequently indicated that their cell number was 3107.

Tony Smith, an inmate "that just murdered his roommate."  Inmate Lee claimed that Smith "hit [him] with a radio in the head [] and sexually assaulted [him] during [and after] the fight" (on cross-examination, the FDOC established that Lee testified at his deposition that he was housed in cell number 2214 at the time of Smith's assault, and when confronted with his prior testimony Lee said he was mistaken then and that the correct cell number is 3221, but Lee later testified at the evidentiary hearing that the assault occurred in cell number 2214).  When asked how he knew that Inmate Smith assaulted him, at the direction of SRCI staff and because Lee failed to assault Plaintiff, Lee stated, "Because I'm not dumb he [Smith] said straight up . . . you should have did what the police told you to do."  Inmate Lee testified that as a result of the attack, his nose was busted, and he required stitches on his nose, as well as his right eyebrow area and chin; he also sustained a fractured jaw and "busted" leg, in addition to being sexually assaulted.  Inmate Lee further testified that, although he could not see Plaintiff's cell on May 1, 2014 (by that time Lee was no longer Plaintiff's cellmate), he could hear things that occurred in Plaintiff's cell, and he heard Plaintiff's hand being injured in the flap when Plaintiff was being cuffed for transport to his interview with the inspector.  Inmate Lee further testified that Plaintiff was given a "bogus" DR on May 1, 2014, for having a "weapon" in his cell (he surmised that the officers planted it there), and as a result Plaintiff was placed on CM-1 (as was Inmate Lee, although the reason for Lee's placement on CM-1 is not evident from his testimony).

B.     Testimony and Evidence Introduced by the FDOC

●     During Plaintiff's case-in-chief the FDOC introduced exhibits or made proffers to impeach or call into question the veracity of the testimony of some of Plaintiff's witnesses (all of the FDOC's exhibits are filed as attachments to doc. 68).  This evidence includes:

(1)     that Inmate Claude has prior felony convictions, including for battery on a law enforcement officer (in April 2003) and battery on facility staff (in January 2005);

(2)     the June 6, 2014, deposition testimony of Inmate Davis (FDOC exh. 2)[14];

---

[14] The deposition transcript is lengthy, at fifty-five pages, and it need not be summarized here.  The court notes, however, that Inmate Davis made it clear at the outset of his deposition that he wished to join Plaintiff in a class action lawsuit (*see* FDOC exh. 2 at 4–5 (testifying that he too had been "excessively gassed" and intimidated and thus hoped to be a part of a class action lawsuit)).  He then indicated he was ready to proceed with the deposition, noting that it was "a team thing" and asking Plaintiff (who was present for his deposition) if he was ready for Davis to "do [his] thing" (*id.*

(3)      that Inmate Clay, who is serving a life sentence, has twice been convicted of DRs for "lying to staff" (*see* FDOC exh. 1 (showing, that among 28 DRs issued to Inmate Clay, 2 were issued to him for lying to staff)); and

(4)      that Inmate Lee, who is serving a life sentence for first degree murder, was housed in the C-Dorm in cell number 3107 from January 24, 2014 through February 13, 2014, in cell number 3212 from February 13, 2014 through April 29, 2014, and in cell number 3214 from April 29 or 30, 2014 through May 7, 2014 (the FDOC explained Inmate Lee's housing history to establish that he was never in cell number 2105 (or "25 or 07"), 2214, or 3221, as he testified at the evidentiary hearing and/or at his deposition).[15]

- The FDOC also presented the testimony of ten witnesses.

(1)      Inmate Clarence Flowers (eh. (day 1) at 201–209)

Inmate Flowers testified that he was housed in the same cell as Plaintiff in B-Dorm, commencing in approximately December 2013 or January 2014. He testified that no member of SRCI's staff had ever asked him to harm Plaintiff in any way or indicated that he would be rewarded if he harmed Plaintiff. He further testified he never physically harmed Plaintiff and never was involved in any type of physical confrontation or altercation with him. Inmate Flowers stated he never observed Inmate Jenrette assault, hit, or harm Plaintiff. He also testified that did not observe Plaintiff being escorted to the ICT hearing on March 24, 2014, as he (Flowers) had been moved to a different dorm by that time. Finally, he testified he never heard an officer refer to Plaintiff as a writ writer; nor did any officer tell Flowers to sexually assault Plaintiff, advise him they would "take

---

at 9). When Plaintiff confirmed that he wished for Davis to proceed, Davis responded by stating, "We will proceed to give them what they need." *Id.* at 10. He then testified, in pertinent part, that Plaintiff had been assaulted by "Psycho," Lt. Gielow, and another lieutenant "on a constant basis" (*id.* at 27, 48) and generally that Plaintiff had been beaten, starved, and "mentally and physically tortured" (*id.* at 32, 39–40, 52). When pressed for specifics, Inmate Davis essentially failed to provide any. Upon questioning by Plaintiff, however, Inmate Davis testified that he personally witnessed Plaintiff's hand being slammed in the food flap (and saw Plaintiff's hand swell as a result), as well as Plaintiff's requesting to be seen by medical and his request being denied (*id.* at 49–50). Finally, at the end of his deposition, Inmate Davis made several curious comments to Plaintiff, including advising Plaintiff that while he (Plaintiff) was pursuing an action in federal court, he (Davis) was pursuing his own action at the "Union City Courthouse" in Lake Butler (apparently related to his former incarceration in Union County), and he stated to Plaintiff that "[w]e are unchekable, you hear[] me?" (*id.* at 51; *see also id.* at 17).

[15] The evidence at the hearing indicated that the first number of the cell number denotes the floor (i.e., second or third) on which the inmate is housed.

care of him" if he "handed Springs' ass to him on a state tray," or ask him to go to C-Dorm and harm Plaintiff there or anywhere else.[16]

> (2) John J. Kolodziej, a Colonel at SRCI (*see* eh. (day 1) at 209–250 & (day 2) at 14–25)

Col. Kolodziej initially provided general information about SRCI, including that CM inmates are housed there. He also explained why and how inmates are assigned to CM. He noted that CM has three levels, with level I being the most restrictive and III the least restrictive, and that the ultimate goal of CM is to release a CM inmate to the open population. Col Kolodziej explained that inmates sometimes exhibit behavioral issues, and under certain circumstances staff can respond to those issues with the use of force. In brief, he noted that an officer may use reactionary force, that is, act immediately if the life of an officer or inmate is at risk, and that the amount of such force depends on the circumstances of the situation. An officer may also use a pre-authorized use of force, which is planned force that requires authorization, and includes the use of chemical agents.

There are two kinds of chemical agents, OC and CS, and they are stored in a controlled room at SRCI called the arsenal. The agents must be checked out from the arsenal, as must any type of weapon, ordnance or munition, and a record is created when an item is checked out. The items are also inventoried at every shift to ensure that all are accounted for and that the arsenal's records are consistent with its inventory. With respect to chemical agents, every cannister of agent, once put into service, has its own record and must—along with its declining balance over time—be tracked. The record is stored with the cannister until the cannister has a zero balance, at which time it is disposed of by the arsenal. Additionally, each time a chemical agent is used, a record is made as to who authorized its removal, who removed it, the time it was removed, the time it was returned, and the amount (grams) of agent used during its removal; the record must also include signatures of the officer who returned the agent and the supervisory official who confirmed that the use-of-force reports are consistent with, for example, the amount of grams used and the type of agent applied.

---

[16] At Plaintiff's request, the FDOC introduced Inmate Flowers' criminal history, which includes convictions for sale and possession or manufacture and delivery of cocaine, burglary, grand theft, and false information to pawn broker, and it reflects that Flowers' anticipated release date is April 30, 2016 (FDOC exh. 4). The FDOC's exhibit also includes a record documenting that Inmate Flowers received a DR for lying to staff in January 2013 (*id.*).

Thus, Col. Kolodziej explained, an officer could not apply chemical agents without reporting it because the officer "has to answer to somebody about the amount left in his canister, whether the seal is broken, [and] whether something was checked out." He further explained that following the use of chemical agents, a complete packet is compiled—which includes a video (if any), documentation of the pre-authorization, incident and use-of-force reports, medical records, witness statements, and the names of all officers involved—and the packet is sent to the FDOC's central office in Tallahassee. Col. Kolodziej confirmed that "each and every time [] chemical agents are deployed in [SRCI]," a packet must be provided to FDOC officials.

Continuing, Col. Kolodziej testified that prior to applying chemical agents, an officer must first try to bring a disruptive inmate into control through verbal counseling. If such counseling fails, the shift supervisor (who is either a captain or lieutenant) must contact the warden (or the duty warden in the warden's absence) and request authorization to administer chemical agents and for the type of agent to be administered (i.e., OC, the least incapacitating, or CS).[17] If authorization is obtained, the officer(s) must nevertheless give an inmate a final warning (e.g., advise the inmate that if he stops his behavior he will not be sprayed). If the inmate complies, chemical agents are not administered; if he does not comply, chemical agents are administered.

When chemical agents are used they must be administered in three one-second bursts. Thereafter, an inmate can shower and decontaminate, and the shower should occur within twenty minutes of the application of chemical agents. The inmate is then given a pair of boxer shorts, at a minimum (an inmate can be denied any additional clothing or property based on security concerns or the inmate's behavior). The inmate is also taken to the medical department, where the medical staff performs a variety of functions, such as assessing the inmate's vital signs, providing additional decontamination, or flushing an inmate's eyes.

---

[17] Col. Kolodziej noted that correctional officers also carry "small MK-4 cannisters" of chemical agent on their belts, and this agent can be applied in limited, restricted situations, such as those necessary to preserve an officer or inmate's safety. However, there are safeguards in place with respect to the waist cannisters as well. For example, an MK-4 cannister—which must be obtained from the arsenal and have an accompanying report, as with the OC or CS cannisters—is sealed, and it is examined at the beginning of an officer's shift to ensure that the seal is intact. If its seal is broken, inadvertently or intentionally, or any of the agent is used, an incident report is created, and the officer in charge must weigh the cannister and compare its weight to that noted on its record.

Col. Kolodziej also discussed cell extraction teams and noted that these teams are comprised of six officers who—after obtaining pre-authorization from the warden or his designee—may forcibly remove an inmate from his cell after all other lesser options of force have been exhausted. Prior to deploying an extraction team, a video-recording is activated, and officers put on protective gear (i.e., large black-armored type suits), appear in front of the video camera and explain their area of responsibility, and then approach the inmate's cell and provide a final opportunity for the inmate to comply. Col. Kolodziej explained that a cell extraction team could not be deployed covertly and noted that both a video recording and incident reports are created whenever the team is deployed.

Col. Kolodziej next offered testimony concerning the Rapid Response Riot Team ("RRRT"). He explained that this team is a fourteen-man multi-functional team, comprised of correctional officers who are highly trained in—among other areas—crowd control techniques and the use of lethal munitions, non-lethal munitions, and chemical agents. Only the warden or his designee can activate the RRRT, as it is used only in the face of a very serious situation, such as an inmate taking a staff member hostage, rioting inmates, or inmates taking control of a dormitory, recreation yard, or some other portion of the prison. Members of the RRRT have pagers and if needed must be summoned to SRCI, as members would not be on duty at the same time, whereupon they meet at a designated meeting point, are briefed, and are given directions and assignments.

Continuing, Col. Kolodziej explained the protocol that officers follow if a weapon is found in an inmate's cell. He noted that the officer who found the weapon must complete a detailed incident report, outlining—for example—when the weapon was found, where it was found, how it was found, and who found it. The weapon is then photographed or placed in evidence (some weapons are destroyed, and thus a picture is taken of it prior to its destruction; others need not be destroyed and thus no photographs are necessary). The responsible inmate is issued a DR, which he can contest at a disciplinary hearing if he so wishes.

Turning to Plaintiff's allegations, Col. Kolodziej testified that he reviewed the arsenal's records and found no records indicating that chemical agents were checked out, unaccounted for, or used on October 16, 2013, December 11, 2013, and December 16 or 17, 2013, the dates on which Plaintiff states he was gassed. He also looked for use-of-force reports documenting any type of force used against Plaintiff—such a beanbag shot, gassing, or use of the RRRT or cell extraction

team—during Plaintiff's entire stay at SRCI, and none were found.  To be sure, he noted, the RRRT has <u>never</u> been activated at SRCI,[18] and to the extent Plaintiff had confused a cell extraction team with the RRRT, Col. Kolodziej repeated that no cell extraction team was ever authorized or used against Plaintiff.

(3)     Shelly K. Szalai, a Nurse Practitioner at SRCI (*see* eh. (day 2) at 25–37)

Sheila Szalai is a nurse practitioner ("NP") who has worked at SRCI since approximately December 2000.  She noted that a medical record, which bears her name and is dated November 18, 2013, reflects that Plaintiff refused even the most basic medical care that day, such as a check of his vital signs and weight.  She stated she did not personally observe Plaintiff refuse care, but two of her colleagues did, and she verified that on that date Plaintiff received no medical care.  She stated her colleagues had no reason to falsify their report (i.e., that Plaintiff refused medical treatment), and to her knowledge they had never falsified a report or been disciplined for any such conduct.  NP Szalai testified that never during her entire term of employment at SRCI has anyone instructed her to deny care to an inmate, including with respect to Plaintiff.

(4)     Michelle Allen, a Registered Nurse at SRCI (*see* eh. (day 2) at 37–90)

Michelle Allen is a registered nurse ("RN") who has worked at SRCI for approximately four years.  Between mid-October 2013 and the first week of May 2014, she was assigned to the main unit, and her duties included charge nursing, where she tended to inmates in the infirmary or those from the open population who appeared for sick call, inmates in their dorms who had made sick calls but could not appear at the infirmary, and inmates on the weekends on occasion.

RN Allen testified she saw Plaintiff on December 16, 2013, for complaints of "having cracks above his eyelids."  She took Plaintiff's vital signs (e.g., blood pressure, heart rate, temperature), and she observed, and noted in her treatment record, that Plaintiff's skin was dry.  She gave Plaintiff two packs of antibiotic ointment to apply to his eyelids, twice a day for four days, and instructed him that if he needed additional ointment he could return to sick call.  She testified that if Plaintiff had

---

[18] Plaintiff testified at the evidentiary hearing that when the RRRT team was deployed on January 27, 2014, he was shot with a beanbag-type device (*see* eh. (day 1) at 246–50).  He claimed that the beanbag injured and scarred the top of his left foot.  He showed the purported injury to the undersigned, and the undersigned noted what appeared to be a raised black spot that was approximately the size of a quarter.  He definitively testified that this injury/scar "was caused by being shot by a beanbag on January 27th [of 2014]" (*id.* at 49–50).

conveyed any additional complaints she would have recorded them in her treatment record of December 16, which record, she noted—as with all of her treatment records—was created at the time of the patient's visit, not after the fact. Additionally, RN Allen explained that if Plaintiff had been gassed on December 16, he would have been given the opportunity to go to the medical department, and medical staff would have been required to use a different type of treatment record, known as an ER form (with an accompanying "body sheet"), which is a "specific form that is only used for use of force or for injuries." For a gassing, the ET form includes sections for indicating whether the inmate showered before coming to medical, had any injuries, or had difficulty breathing. The form also provides for a referral to a physician if necessary (*see* FDOC exh. 6 (a sample/blank ER form and body sheet)). She testified that if an inmate who has been gassed refuses to go to medical, a nurse (such as herself) goes to the inmate's cell to note the refusal; however, the nurse must nevertheless prepare an ER form. She clarified that the ER form is used for any use of force, including a cell extraction or the like, and it is used even if an inmate refuses treatment. She also explained that ER forms are always included in an inmate's medical records, regardless of whether an inmate refused treatment following a use of force, and she noted that correctional officers do not have access to an inmate's medical file and thus cannot remove or alter an inmate's medical records.[19]

RN Allen testified that she also saw Plaintiff on January 27, 2014, for sick call. He complained of gas and gas pains and stated his last bowel movement was three days prior, on January 24, but his stool appeared normal and he was not experiencing diarrhea. RN Allen examined Plaintiff and heard abnormal bowel signs. She referred Plaintiff to an advanced registered nurse practitioner, who could—and did—prescribe simethicone, "KOP," meaning it could be "kept on [Plaintiff's] person" in his cell. Plaintiff did not report any other symptoms or injuries to RN Allen; if he had, she testified, she would have included those complaints in her report and

---

[19] Inmate Davis testified at his deposition that if someone is sprayed with chemical agents, they are taken to see a nurse and there will be a medical record (FDOC exh. 2 at 28–29). Thus, specifically with respect to Plaintiff, Inmate Davis testified that Plaintiff's medical records "will tell you the exact date and time that he got sprayed, when they took him to the nurse, [and] when they brought him back" to his cell (*id*. at 28). He also testified that Plaintiff had been gassed and/or assaulted so many times there is no way they could "cover all of them up," so even if they were somehow able to cover up one or two assaults, there definitely would be records, including medical records (and presumably those relating to the need to obtain authorization before gassing him) (*see id*. at 25, 28–30).

documented any visible injuries. Stated another way, the fact that no additional complaints or injuries are noted in the treatment record of January 24 means no others were made or observed.

The medical records also reflect, and RN Allen confirmed, that she saw Plaintiff again on March 24, 2014, after he put in a sick call requesting a refill of the simethicone. She explained that at this visit, as with others, she followed the SOAPE protocol, that is, she: (1) obtained and recorded subjective information from the patient; (2) noted her objective findings and observations; (3) made a preliminary assessment; (4) developed a treatment plan; and (5) educated and instructed the patient. She testified that on March 24 Plaintiff subjectively complained of excessive gas but no pain; she objectively noted some hyperactive bowel sounds (which she described as gas bubbles in all four quadrants); she assessed gas; she referred Plaintiff's chart to a nurse practitioner, so his simethicone could be renewed; and she instructed Plaintiff on how to take his medication and advised him to follow up at sick call as needed. RN Allen testified that had Plaintiff complained of something other than gas she would have included the complaint(s) in her treatment record of March 24, and she emphasized that she records all subjective complaints made by inmates and thus would have done so had Plaintiff made any additional complaints.

RN Allen next discussed another treatment record made by a colleague two days later, on March 26, 2014, which states that although Plaintiff claimed his hand had been shut in a door flap, upon being questioned by medical staff he denied the claim and refused a medical examination. He was also noted to be in no distress. RN Allen testified, after a review of the medical records before her, that Plaintiff had gained approximately nine pounds between December 2013 and March 2014 (the time period during which Plaintiff claims he was "starved").

RN Allen further testified that no correctional officer has ever asked her to deny care to an inmate, including Plaintiff,[20] or asked her to falsify medical records. She explained that although all inmates are escorted by a correctional officer when they come to sick call, the subjective complaints she records are those reported by the inmate, and her treatment, assessment, and plan are based only on the SOAPE protocol, not on background or outside information that might have been

---

[20] At about this point during RN Allen's testimony Plaintiff interjected and stated his "objection that her testimony is wholly monstrously [sic] . . . false" (eh. (day 2) at 66). Upon follow-up questioning by the undersigned, RN Allen stated that her testimony was entirely truthful and her medical records accurately reflect her encounters with Plaintiff.

provided by the escorting officer or someone other than the inmate (e.g., if she goes to a dorm, an officer might indicate that an inmate is complaining that he has pain in a certain area, but she records only those complaints that are provided to her by the patient).

After the foregoing testimony of RN Allen, Plaintiff stated that he maintained his earlier "objection" that, essentially, RN Allen was lying (*see* footnote 20, *supra*), and it was evident that Plaintiff wished to offer testimony in support of his "objection" (*see* eh. (day 2) at 73). At this point, however, it was becoming increasing clear to the undersigned—based on the testimony developed thus far at the evidentiary hearing—that Plaintiff's allegations (at least) with respect to gassings, starvation, use of the RRRT or cell extraction team, and denial of medical treatment were untrue. Thus, prior to allowing Plaintiff an opportunity to testify with respect to RN Allen's treatment, the undersigned advised Plaintiff of the consequences of testifying falsely under oath. In pertinent part, Plaintiff was warned that he could be prosecuted for perjury and, if convicted, would face a term of federal incarceration that would run consecutive to the state sentence he was then serving. The undersigned concluded her comments by stating, "I just want to be very clear that you understand the consequences of perjury in a federal court proceeding," and then giving Plaintiff the opportunity to testify concerning RN Allen's treatment if he still wished to do so (*id*. at 74–75).

Plaintiff then testified, essentially, that RN Allen lied with respect to her treatment record of January 27, 2014, because he did not complain only of gas and gas pains but also showed her a wound on his foot and complained of "additional internal injuries" and soreness and pain in his arm, chest, and back (*id*. at 75–76). He testified that although he offered these additional complaints, RN Allen failed to note them on her treatment record (*id*. at 75–78). RN Allen then reiterated her testimony that on January 27 Plaintiff made no complaints other than those included in her treatment record, and she stated she was "100 percent" sure that Plaintiff had made no other complaints (*id*. at 78). Undeterred, Plaintiff continued, and testified that on December 16, 2013, RN Allen did not give him two packs of antibiotic ointment as she testified and indicated in her treatment record (she

again confirmed she was "100 percent sure" that she provided the ointment to Plaintiff) (*id.* at 79–82).[21]   In conclusion, Plaintiff testified as follows:

> I'm testifying under oath that Ms. Allen—anywhere in here [her treatment records] that she's documenting that she gave me a treatment is not accurate, Your Honor. I keep saying it that way because I can attest to the fact that, yes, I did see her, and I can attest to the fact that, yes, it's possible that she may have written these documents or signed her name, but as far as the treatment and as far as a full record of my complaint being recorded to her is not accurate.

(*id.* at 82).

(5)   Steven A. Schwartz, M.D. (*see* eh. (day 2) at 90–119)

As noted *supra*, during the telephonic conference Plaintiff testified he had been "trying [unsuccessfully] to get to medical" because he was in pain, injured, and "breaking out" due to his SRCI-issued clothing (tc. at 63).   Thus, FDOC's counsel arranged for Plaintiff to be seen by Dr. Schwartz on May 16, 2014, the day after the telephonic conference.

Dr. Schwartz testified at the evidentiary hearing.   He stated he is a medical doctor, licensed in the State of Florida, and is the Chief Medical Officer at SRCI.   He noted he began working at SRCI only three or four months prior to the hearing (or, approximately, in February or March of 2014).   Dr. Schwartz testified that when Plaintiff presented on May 16, he appeared in no acute distress, meaning, no emergency was evident.   Plaintiff's vital signs—blood pressure, pulse rate, respiratory rate, and weight—were all within normal limits.   Dr. Schwartz asked Plaintiff what was wrong, and Plaintiff stated he was having trouble with his right elbow, with his teeth in the upper right jaw area, and with respect to a "gunshot wound" on his left foot; he also complained of rectal bleeding/bloody stool and difficult urination.   Dr. Schwartz examined Plaintiff, focusing on the areas of which he complained, and in doing so he physically touched Plaintiff and was "within a foot" of him.   Dr. Schwartz observed a healed surgical scar near Plaintiff's right elbow, which was from a surgery that occurred several years prior, but no other abnormalities were noted and the right elbow was functional.   Dr. Schwartz also examined Plaintiff's left foot and noted in his treatment record

---

[21] A subsequent treatment record, dated June 4, 2014, reflects that RN M. Donahoo gave Plaintiff two tubes of an over-the-counter ointment, after Plaintiff complained of itching and cracking skin between his toes (FDOC exh. 7 at C5).   This treatment record also shows that Plaintiff was taking simethicone at the time (*id.*), as does a treatment record dated May 22, 2014 (*id.* at C8 (also reflecting Plaintiff's weight at 134 pounds)).

that this examination revealed an old granuloma that appeared to be from an injury sustained by Plaintiff possibly months or even years earlier. Plaintiff's foot was not swollen or discolored, his gait was unaffected, no signs of a recent injury were observed, and Plaintiff was able to get on and off the examining table without difficulty or assistance (*see* eh. (day 2) at 96, 98–99; *see also* FDOC exh. 7 at C11). Likewise, Dr. Schwartz noted no acute problem with Plaintiff's jaw, though he observed that Plaintiff's teeth were unhealthy. His observation, however, caused no alarm, because Plaintiff's gums were not bleeding, and he saw no indication of an acute problem (*see* eh. (day 2) at 95–96; *see also* FDOC exh. 7 at C11). Dr. Schwartz thus concluded that Plaintiff could simply see an institutional dentist for his complaints because no treatment from a medical doctor such as Schwartz was warranted.

With respect to Plaintiff's complaints of rectal bleeding, Dr. Schwartz testified that he advised Plaintiff to undergo a rectal examination, but Plaintiff declined to do so due to his "religious preference" (eh. (day 2) at 99; *see also* FDOC exh. 7 at C19). Thus, at Plaintiff's request/suggestion, Dr. Schwartz ordered stool guaiac testing, which would involve the use of guaiac cards and allow Plaintiff to obtain his own stool samples (three). He instructed Plaintiff on how to collect the samples and preserve them on the cards.[22] Similarly, to address Plaintiff's complaint of difficult urination, Dr. Schwartz noted he could have conducted a prostrate examination at the same time as a rectal examination, but he was unable to do so due to Plaintiff's "preference." Thus, Dr. Schwartz ordered a urinalysis; he also ordered a complete blood count ("CBC"). He completed his treatment record by stating, "Again, no evidence of acute injuries or acute medical problems based on my exam. Inmate [Springs] can go to sick call for problems" (*see* FDOC exh. 7 at C11). Dr. Schwartz noted that he created his treatment record just after Plaintiff left, that he did so while the encounter was fresh in his mind, and that his report accurately reflected his examination and encounter with Plaintiff. Further, he testified, he recorded all of Plaintiff's complaints, and if Plaintiff had made additional complaints he would have included them in his treatment record and likely would have ordered additional tests. Dr. Schwartz testified that he told Plaintiff that if he

---

[22] Dr. Schwartz noted that Plaintiff was familiar with guaiac testing, as he actually asked Dr. Schwartz to proceed in this manner and asked for the guaiac cards (evidently before Dr. Schwartz discussed this alternate method of testing).

went to sick call and "still [did not] feel well," he could come back and see him again.  Finally, Dr. Schwartz noted that no correctional officer or other member of SRCI's staff suggested that he not treat Plaintiff, and he testified that he treated Plaintiff as he would have treated any other inmate who sought medical care from him.

In late May 2014, the results of the various tests ordered by Dr. Schwartz were obtained. The guaiac testing revealed no blood in Plaintiff's stool (all three cards were negative); the CBC results were largely within normal limits, and the two (of sixteen) areas that were slightly outside of normal limits were medically insignificant and in no way suggested an issue of concern or that Plaintiff was anemic or otherwise experiencing symptoms associated with blood loss, as might occur if a person had rectal bleeding; and the results of Plaintiff's urinalysis were fully within normal limits (*see* eh. (day 2) at 104–07; FDOC exh. 7 at C13–4).

Plaintiff testified that when he first saw Dr. Schwartz for "his so-called examination," Plaintiff was asked to explain why he was there, and he stated that the "department" had arranged for him to be seen "for injuries that [he was] having on the inside" and injuries sustained due to officers' use of force (eh. (day 2) at 86–86).  Plaintiff testified that he advised Dr. Schwartz he had "sharpness of pain" in his chest area and that he "pointed to [his] gastro area" (*id*. at 87).  Dr. Schwartz asked Plaintiff "about doing an anal exam," which examination, Dr. Schwartz indicated, he would do "by hand."  Plaintiff testified he objected to such an examination because it was against his Islam faith and,[23] allegedly, because the examination would have been visible to other inmates and staff "walking by" (*id*. at 87–88).  Plaintiff further testified that Dr. Schwartz observed and examined him from a distance of approximately two-and-a-half to three feet away (*id*. at 87).  He testified, as he did with respect to the reports prepared by RN Allen, that Dr. Schwartz's report was inaccurate (*id*. at 84–85).

(6)    Grant Kasanovich, a Correctional Officer with SRCI (*see* eh. (day 2) at 119–131)

Ofc. Kasanovich testified that while he had no recollection of interacting with Plaintiff on March 22, 2014, he knew he had never intentionally closed a food flap on Plaintiff's hand and thus

---

[23] Upon questioning by FDOC's counsel, Plaintiff acknowledged he had previously undergone a colonoscopy (eh. (day 2) at 89).

did not do so on March 22.  Similarly, he stated he had no recollection of ever escorting Plaintiff to medical, but he was certain he had never struck or harmed Plaintiff.  He also explained that he could not have been in the ER specialist room with Plaintiff because that room is locked (unless a nurse is there), and thus he could not have pulled Plaintiff into the room.  He noted that only medical staff have keys to that room, because medication and other medical supplies are kept there, and neither he nor any other correctional officer could gain entry.[24]  Ofc. Kasanovich also stated that no one at SRCI ever asked him to harm Plaintiff or retaliate against him for filing grievances.

(7)    Trampus Gray, a Major with SRCI (*see* eh. (day 2) at 131–160)

Major Gray testified that he had no interaction with Plaintiff the day he arrived at SRCI and, given his job duties on October 16, 2013, he would have had no reason to have contact with any inmate—including Plaintiff—on the day of an inmate's arrival.  Thus, Major Gray could not have gassed or beaten Plaintiff on October 16 and did not do so.

Major Gray testified that if an inmate claims to have been abused by staff or another inmate, the inmate is required to fill out a witness statement describing the abuse, an incident report is generated, and Major Gray must conduct a "management information notification" and supply a copy of the report directly to the Inspector General's office.  Major Gray testified that Plaintiff did not complain to him in mid-March 2014 of staff or inmate abuse.[25]

There was some confusion regarding the date on which the mid-March 2014 ICT meeting occurred, the members of that ICT, how many ICT meetings Plaintiff attended, and the nature of those meetings (e.g., some meetings are held at set intervals to consider whether an inmate's CM level should remain the same or be increased or decreased; some are held when an inmate requests protective management).  Major Gray's testimony was therefore suspended so FDOC's counsel could obtain records to show the dates and nature of the meetings Plaintiff attended (as it appeared as though Major Gray was not at the March meeting to which Plaintiff referred).  FDOC's counsel

---

[24] Plaintiff objected to this testimony of Ofc. Kasanovich as "not accurate" (eh. (day 2) at 125).

[25] Plaintiff testified at the evidentiary hearing that in mid-March 2014 Major Gray ignored Plaintiff's complaints at an ICT hearing, despite Plaintiff's showing him the scar on his foot and other injuries allegedly inflicted upon Plaintiff during his incarceration at SRCI (eh. (day 2) at 127–29).

subsequently advised the court that a SRCI classification officer, Ms. Neal, could clear up the confusion, and she testified later that day.

(8)     Kyle Hall, Correctional Officer at SRCI (*see* eh. (day 2) at 160–178)[26]

Ofc. Hall testified that he never administered chemical agents or otherwise gassed or sprayed Plaintiff, physically harmed him, hit him, or body slammed him.  Ofc. Hall stated that he did not recall locating a civil rights complaint in Plaintiff's property, but he knew he had never destroyed any such complaint; nor did he make comments to Plaintiff about his having written prior complaints or grievances.  Ofc. Hall also testified that he never asked Inmate Flowers to harm Plaintiff or encourage any other inmate to do so, and he has never rewarded an inmate for engaging in such behavior.  He stated he never planted a weapon in Plaintiff's cell (or asked another inmate to do so) for any reason, including to justify a use of force (e.g., cell extraction).  In response to one of Plaintiff's questions, Ofc. Hall noted that he could have been present when Plaintiff arrived at CM on December 11, 2013, but he did not recall Plaintiff (he noted that at that time he was responsible for the care, custody, and control of approximately 200 inmates and that the composition of that population changed from week to week; thus, over the course of three months he normally would have interacted with hundreds of inmates).  Ofc. Hall reiterated that he could have been present on December 11 when Plaintiff arrived at CM, but he could not specifically recall whether he was or not because he interacts with so many inmates as a part of his daily routine; he noted, however, that had there been a gassing incident the day Plaintiff (or any other) inmate arrived on CM the event would have stood out in his mind, a report would have been prepared, and his name (as well as the other officers who participated in the gassing) would have been noted in the report.

(9)     Micha Neal, Classification Officer at SRCI (*see* eh. (day 2) at 178–194)

Ms. Neal testified that as the result of an inmate request submitted by Plaintiff on February 24, 2014, an incident report was created which reflects Plaintiff's complaints that "he was in fear

---

[26] Prior to Ofc. Hall's testimony Plaintiff confirmed under oath that the allegations in his complaint were true (e.g., that Ofc. Hall gassed and beat him on December 11, 2013, when Plaintiff arrived at CM, after finding in Plaintiff's possessions a § 1983 complaint against officials at Union C.I., and tore up the civil rights complaint; gassed him and beat him on December 16 or 17, 2013, after he discovered Plaintiff trying to file grievances; and "body slammed" him on February 6, 2014) (eh. (day 2) at 156–58).  Plaintiff also testified that these abuses contributed to his severe gastric and bowel problems (*id.* at 159).

for his life regarding [his] roommates."  More specifically, Plaintiff alleged that in December 2013 and January and February 2014, he was housed with Inmates Clarance Flowers and Cedric Jenrette and was assaulted.  Plaintiff claimed that Inmate Flowers assaulted him because Plaintiff "went to security because [Flowers] was always gunning down the female staff," but Plaintiff was nevertheless required to stay in a cell with Flowers.  Plaintiff also alleged, "As long as I'm around these two inmates I'm in danger because I went to the administration [on them]."  Ms. Neal explained that on March 14, 2014, Captain Jackson began an investigation into Plaintiff's allegations.  The investigation revealed that although Plaintiff was housed with Inmate Flowers from December 11–14, 2013 (in cell B-3217), and from December 14, 2013 to February 6, 2014 (in cell B-3221), he was never housed with Inmate Jenrette (although Jenrette was housed below Plaintiff from December 10, 2013 through January 22, 2014) (*see id.* at 182; FDOC exh. 8).  In light of this information—i.e., that Plaintiff had never been housed with Inmate Jenrette and was not currently housed with Inmate Flowers—Captain Jackson recommended that no action be taken, such as placing Plaintiff on protective management or changing his cell.  The ICT participants, who met on March 24, 2014, were Ms. Neal, Col. Kolodziej, and "Ms. Courtney" (but not Major Gray), and they adopted Capt. Jackson's recommendation.  Ms. Neal testified that during the ICT meeting Plaintiff did not allege he had been threatened by an inmate named "Dewberry," he did not point out wounds or visible scars, and he did not request medical treatment.[27]

  (10) Maurice Radford, Institutional Inspector for the Florida Department of Corrections, Office of the Inspector General (*see* eh. (day 2) at 194–235)

  Inspector Radford, a state certified law enforcement officer with twenty-seven years of experience, testified he is now an institutional inspector for the FDOC and has been so employed for just over one year.  He is assigned to SRCI, but he also conducts investigations at other FDOC facilities in the panhandle of Florida.  He has previous experience as a state law enforcement officer, including at the command level, and with a Florida sheriff's office where he was third in command for more than a decade.

---

[27] Major Gray was not recalled, as Ms. Neal's testimony made it clear that he did not participate in the ICT meeting held March 24, 2014.

Inspector Radford testified that he was directed by his superior to conduct an "inquiry," or preliminary investigation, regarding Plaintiff's allegations. The inquiry was a result of Attorney Grimes' providing to the IG's office a copy of the document Plaintiff filed in the instant case, titled "Emergency Injunction" (*see* doc. 4 (which the undersigned initially construed as a complaint and which generally alleges that Plaintiff has been the victim of gassings, physical abuse by SRCI staff and inmates, withholding of food, and deprivation of adequate medical care); *see also* FDOC exh. 9 (Inspector Radford's Report)).

Inspector Radford testified that when he arrived at SRCI on May 1, 2014, and asked to speak to Plaintiff, he was advised that Plaintiff was refusing to see him or come out of his cell. He testified that normally when an inmate refuses to be interviewed, he simply leaves because he does not "try to convince people to talk to me as practice." However, due the nature of Plaintiff's allegations, he decided to go to Plaintiff's cell. When he reached the front of the cell, he identified himself and asked Plaintiff if he was willing to come out and talk to him. Plaintiff said yes but indicated he needed to clean up his cell first and use the restroom. Inspector Radford also advised Plaintiff that he could not wait very long and stated he would give Plaintiff five minutes (which, Plaintiff stated, was a sufficient amount of time). Inspector Radford then stepped away from the door front and waited approximately five minutes; he then told Plaintiff he "needed to do it now" and Plaintiff finally agreed to do so.

Correctional officers then removed Plaintiff from his cell, and Inspector Radford witnessed them do so. He testified that Plaintiff's removal was "normal" and "uneventful," and he observed no physical abuse, threats, or any unusual occurrences. He testified that he recalled that "the sergeant himself [McCranie] opened the handcuffing portal flap . . . one of the officers with the key opened the flap, I was present, Mr. Springs backed up to the door as normal protocol, extending his hands through the portal [and] the handcuff—temporary hand restraints were applied." Inspector Radford definitively testified that no officer yanked Plaintiff's hands through the portal, slammed the door flap on Plaintiff's hand, or injured either of his hands. In response to the court's questioning, Inspector Radford made it clear that if any such conduct had occurred, he would have seen it because he was standing right there. Further, had an officer intentionally harmed Plaintiff in his presence, he testified, he would have intervened and actually made an onsite arrest of the

offending officer.  Inspector Radford explained that not only would he have been derelict in his duty if he failed to intervene, but he also would have been "possibly even criminally negligent" (eh. (day 2) at 207, citing Fla. Stat. § 944.35[28]).

Continuing, Inspector Radford testified that immediately upon exiting the cell Plaintiff expressed concern about "what the officers may do as far as searching his cell and destroying his property, to include his legal documents, which were of utmost importance to him."  Upon reaching the interview room, Inspector Radford explained to Plaintiff his job duties and responsibilities, which he described as "basically the police officer of the prison," who investigates crimes of officer misconduct similar to the allegations made by Plaintiff.  He assured Plaintiff that his investigation was separate from the correctional officers' roles and responsibilities and that he does not work for them or have their same roles or responsibilities.  Inspector Radford obtained a recorded sworn statement from Plaintiff, and he did not dictate to Plaintiff what he could say prior to turning on the recorder and did not otherwise limit or restrict Plaintiff with respect to what Plaintiff could say.

According to Inspector Radford, Plaintiff "raised two primary issues":  (1) that Lt. Gielow shot him with a "beanbag round type munition" in the fall of 2013; and (2) that Ofc. Hall picked him up and "body slammed" him onto the concrete in the recreation yard (Plaintiff did not bring up the alleged gassings or other allegations of staff and inmate abuse, and Radford testified that therefore his investigation centered around Plaintiff's "two primary issues," and not the numerous other allegations in Plaintiff's complaint).  With respect to the alleged beanbag incident, Plaintiff was unable to state precisely when it occurred, though Plaintiff advised that a document (presumably a use of force report or arsenal log) would reveal the date.  Plaintiff advised Inspector Radford that he had no witnesses to the beanbag incident, but he showed Inspector Radford a scar on the top of his left foot, which he claimed was a result of the beanbag shot.  With respect to Ofc. Hall's alleged body slam, Plaintiff reported he had no witnesses.  He claimed, though, that the slam resulted in internal bleeding and injuries to his neck and back.  When asked if any medical records existed to document Plaintiff's injuries, Plaintiff claimed that "as far as his bleeding, bleeding of the bowels," he had submitted a sick call request but was denied the opportunity to see a nurse.

---

[28] This statute requires any FDOC employee to report instances of staff abuse of an inmate and notes that failure to do so is a misdemeanor.  Fla. Stat. § 944.35(3) (eff. July 1, 2010).

Inspector Radford testified that during the interview, Plaintiff "was preoccupied with security and what they may do" and asked Inspector Radford to follow him back to his cell at the conclusion of the interview, so he could witness "any potential destruction to his property that the security officers may have committed." Inspector Radford agreed to do so and, at the conclusion of his interview, he accompanied Plaintiff during the escort to his cell. He testified that while they were en route, Sgt. McCranie advised Plaintiff that his cell had just been searched and that contraband—a needle—was found. Plaintiff began to argue with Sgt. McCranie, claiming that he had no contraband in his cell, at which time Inspector Radford intervened. Inspector Radford testified that he looked at Plaintiff "in the face just two feet away, and [he] asked him, Demetrius, is that your needle or not, [and Plaintiff's] reply was yes, it is mine. I am allowed to have it." Inspector Radford was quite certain that Plaintiff was not allowed to have a needle in his cell, but he nevertheless asked Sgt. McCranie if Plaintiff could posses such an item, and McCranie responded "of course not he's a CM inmate." Inspector Radford then turned to Plaintiff and said "there you go, Mr. Springs," and he left. As he was exiting the dorm, he stopped by a room where Plaintiff's property was being sorted and inventoried, and he asked the officer there if he could view the contraband retrieved from Plaintiff's cell. The officer showed Inspector Radford a metallic sewing needle with a thread attached that was found in Plaintiff's pillow; what appeared to be prescription medicine containers, with the labels removed, that contained some form of unknown liquids; and "fishing tools," which are papers that are rolled up tightly, have strings attached, and are "used by inmates to pass notes and stuff back and forth from cell front to cell front."[29]

Upon questioning by the court, Inspector Radford indicated that he was not alarmed that officers searched Plaintiff's cell during their interview. He explained that it is a common practice for security to search an inmate's cell for contraband when an inmate is removed from it, so the fact that Plaintiff's cell was searched was not unexpected or unusual.

---

[29] Inspector Radford later testified that some time after May 1, 2014, Plaintiff submitted an inmate request to him, in which Plaintiff claimed (or asked Inspector Radford to state) that he (Radford) witnessed officers plant a sewing needle in Plaintiff's property (tr. 206). Inspector Radford responded to Plaintiff that he witnessed no such thing, and he quoted Plaintiff's earlier response to him on May 1 when he questioned Plaintiff about the needle (i.e., "it's mine, but I'm allowed to have it" (or words to that effect)).

Inspector Radford denied that Plaintiff told him he had been threatened by Sgt. McCranie and Ofc. Engstrom.  He likewise denied that Plaintiff told him he needed medical attention due to an injury to his wrist or that he ignored a request by Plaintiff for medical attention.  Inspector Radford explained that had Plaintiff indicated to him that officers had injured his right arm and "retorn tendons, muscle reconstruction and reconstruction tissues," he would have ceased the interview and referred Plaintiff to medical "first and foremost."  He did not observe any visible injuries to Plaintiff or fail to document any such injuries.  Continuing, Inspector Radford indicated that since he had been on the job such a short time he really did not personally know many SRCI correctional officers and had only met some during interviews in other investigations or inquires.  Thus, his investigation and conclusions were not influenced by personal relationships with the accused officers.  He noted that no correctional officer encouraged him to ignore or discount Plaintiff's complaints, and that he would be committing a "criminal act" if he failed to report something or falsified a report.  Inspector Radford testified that he fully complied with the law and his professional obligations with respect to his investigation of Plaintiff's allegations.  Additionally, in response to questions propounded by Plaintiff, Inspector Radford testified that he has never been disciplined in his current job and, indeed, has "never in [his] 27 plus years of law enforcement career been disciplined for anything, any policy infraction, except for the one that [he] wrote [him]self up for, wrecking a car and being at fault in a car crash."

After Inspector Radford's visit to SRCI, he followed-up his investigation by reviewing Plaintiff's FDOC medical records, including records that pre-date Plaintiff's arrival at SRCI.  His review revealed that "treatment for [Plaintiff's] skin problems such as the mark that he showed me on the top of his foot . . . had been going on for extended years."  He noted that Plaintiff had previously reported blood in stool and that he "found extensive documentation" in Plaintiff's FDOC records indicating that Plaintiff "had reported those symptoms, had been treated and even had surgery performed by outside hospitals for [the] same symptoms, primarily as a result of swallowing batteries."  The court inquired whether Plaintiff had swallowed batteries on more than one occasion, and Inspector Radford responded as follows, "Yes, ma'am, and to the point where they had been removed by operating procedures, x-rays where they had performed x-rays to identify the foreign

objects and so forth.  But all surrounding his complaint and experiencing symptoms of bleeding in his bowels."

Inspector Radford testified that he additionally followed-up by reviewing munitions inventories with respect to the alleged beanbag incident, even though Plaintiff's medical records showed that he had previously received treatment for what appeared to be the same injury to his foot.  He stated that he reviewed SRCI's munitions records and inventories, from the time period of approximately April 2011, forward, and determined that all beanbag-type munitions were accounted for, and the only records indicating that any such munitions had been used reflected that they were used for training purposes on the range.  Stated succinctly, he testified, "Nowhere in the record did it indicate any such less lethal munition, beanbag or otherwise, had been deployed on an inmate or a person here at Santa Rosa Correctional Institution."

In conclusion, Inspector Radford stated that—in light of the fact that no evidence, including witness statements or records, corroborated Plaintiff's claims—he recommended that the inquiry be closed with no further action by the IG's office.

- Finally, the FDOC entered additional exhibits into evidence, including the following exhibits:

(1)    Plaintiff's FDOC medical records (FDOC exh. 5).

(a)  One of these records is a discharge summary, dated December 10, 2013, created just before Plaintiff was discharged from the TCU and transferred to CM (*id*. at B5–B6). This summary states that Plaintiff "has a long history of self-injurious behaviors" and uses such behaviors for "secondary gain" (*id*. at B6).  It further notes that Plaintiff has a "chronic pattern of ingesting foreign objects such as batteries and has gone on multiple hunger strikes resulting in inpatient admissions" (*id*.).  The same record indicates that Plaintiff has a "long history of conflict with authority" and has received a total of 55 DRs since his initial receipt into FDOC custody on August 9, 2001, including 19 for disobeying orders, 11 for spoken threats, 5 for disorderly conduct, and 5 for disrespect to officials, as well as—in the past two years—2 for destroying state property, and 1 each for defacing state property, lying to staff, disobeying orders, spoken threats, and tampering with a safety device (*id*.).  Additionally, the discharge summary reflects that Plaintiff refused his initial physical on October 21, 2013, shortly after his arrival at SRCI, and checks of his

vital signs on October 19, 2013, October 20, 2013, and November 13, 2013 (*id.*; *see also id.* at B15, B43, B65, B66, B67, separate records documenting these refusals).

(b)   The medical records include reports that substantiate NP Szalai's testimony that Plaintiff refused medical care on November 18, 2013 (*id.* at B86).

(c)   The medical records include reports that substantiate RN Allen's testimony that she saw Plaintiff on December 16, 2013, and provided two packs of ointment to him at that time (*id.* at B135–36), saw Plaintiff on January 27, 2014 (*id.* at B131), and saw Plaintiff on March 24, 2014 (*id.* at B129), as well as her testimony that Plaintiff refused to be seen by medical on March 26, 2014, after he retracted his claim that his that a cell door flap was slammed on his hand (*id.* at B129–30).

(d)   The medical records document other instances when Plaintiff received medical care, including on November 12, 15, and 25, 2013 (*id.* at B26/B101, B100, and B99, respectively), January 7 and 21, 2014 (*id.* at B134 and B133); and April 23, 2014 (*id.* at B208[30]).

(e)   The medical records document an additional instance where Plaintiff refused medical care, on May 1, 2014 (*id.* at B210), and multiple instances where he refused mental health services (*see generally* FDOC exh. 5).

(f)   The medical records indicate that Plaintiff had his vital signs checked on additional occasions, including on October 16, 2013 (*id.* at B60), October 23, 2013 (*id.* at B39), and November 26, 2013 (*id.* at B37).

(g)   The medical records include no ER forms from SRCI, although it does include an ER form and accompanying body sheet prepared on September 12, 2013, after officers used chemical agents on Plaintiff at <u>Suwannee Correctional Institution</u> (*id.* at B109–10 (these pages are identical to the form described by RN Allen and the sample form that was introduced as FDOC exh. 6)).

---

[30] This treatment record indicates that Plaintiff was seen "s/p [status post] alleged staff abuse," and that Plaintiff's complaints changed in the "middle of [his medical] assessment" (FDOC exh. 5 at B208). More specifically, Plaintiff initially reported no pain but then complained of pain in the left wrist (*id.*). The nurse noted no signs or symptoms of pain, distress, or injury and noted that range of motion in the wrist was within normal limits (*see id.*; *see also id.* at B209).

(2)     Close Management reports, which substantiate Ms. Neal's testimony and show the dates on which Plaintiff's CM status was reviewed (FDOC exh. 8).

(3)     Plaintiff's inmate requests, informal grievances, formal grievances, and grievance appeals dated between October 2013 and May 7, 2014 (FDOC exh. 12 at 1–275).[31]

(4)     Inspector Radford's report and two compact disc ("CDs").

(a)  One CD, which accompanies Inspector Radford's report in FDOC exh. 9, contains an audio recording of Plaintiff's interview with Radford.  This recording is consistent with Radford's testimony as to the substance of his interview.  It also includes an exchange with Plaintiff at the end of the interview, during which Plaintiff denied under oath that Inspector Radford or anyone else forced him to say certain things or that Inspector Radford told Plaintiff how he must say certain things, as Plaintiff contended at the evidentiary hearing.  The CD also contains an audio recording of an interview Plaintiff had with a different inspector, Johnnie Webb, which occurred prior to Plaintiff's transfer to SRCI.  During this earlier interview Plaintiff made allegations that are strikingly similar to the ones he has alleged here.  For example, Plaintiff advised Inspector Webb he had been "palm punched" by a sergeant at Suwannee Correctional Institution, denied meal trays, assaulted by another inmate at the direction of correctional officers (which inmate was subsequently given special treatment for assaulting Plaintiff), and had his arm twisted in a rough manner.

(b)  The other CD contains various documents or records that Inspector Radford reviewed as part of his investigation into Plaintiff's allegations (FDOC exh. 10).

IV.   DISCUSSION

A.     Findings as to Imminent Danger

In initially reviewing a complaint to determine whether a prisoner is in imminent danger for purposes of § 1915(g), the court must look to the prisoner's complaint as a whole, construing it liberally and accepting his allegations as true.  *See* Brown, 387 F.3d at 1350.  However, where a defendant contests the plaintiff's allegation of imminent danger, the court may require the submission of evidence, including holding an evidentiary hearing, to determine the credibility of the

---

[31] During this time Plaintiff filed seventy inmate requests, grievances, and appeals (*see* FDOC exh. 12, a 275-page exhibit containing copies of these documents).

plaintiff's allegation of imminent danger.  *See* <u>Taylor v. Watkins</u>, 623 F.3d 483 (7th Cir. 2010); *see also, e.g.,* <u>Smith v. Wang</u>, 452 F. App'x 292 (4th Cir. 2011) (unpublished); <u>Fuller v. Wilcox</u>, 288 F. App'x 509 (10th Cir. 2008) (unpublished); <u>Springer v. Mathena</u>, No. 7:13cv549, 2014 WL 773505 (W.D. Va. Feb. 25, 2014) (unpublished); <u>Willink v. Foxworth</u>, No. 6:12cv12, 2013 WL 1501035 (E.D. Tex. Feb. 19, 2013) (unpublished), *Report and Recommendation Adopted by* 2013 WL 1500699 (E.D. Tex. Apr. 13 2013) (unpublished); <u>Tafari v. Baker</u>, No. 9:11cv694/GLS/ATB, 2012 WL 5381235 (N.D.N.Y. Oct. 31, 2012) (unpublished); <u>Tierney v. Hamada</u>, No. 1:12cv117/SOM, 2012 WL 4502935 (D. Haw. Sept. 27, 2012) (unpublished); <u>Springs v. Starling</u>, 3:11cv336 (M.D. Fla. Aug. 26, 2011) (unpublished); <u>Smith v. Dillman</u>, Nos. 7:09cv97, 7:09cv462, 2011 WL 322826 (W.D. Va. Jan. 31. 2011) (unpublished); <u>Henderson v. Corr. Med. Serv.</u>, No. 1:07cv50JLH/JTR, 2008 WL 400937 (E.D. Ark. Feb. 8, 2008) (unpublished); <u>Norwood v. Radtke</u>, No. 3:07cv624/bbc, 2007 WL 5431018 (W.D. Wis. Dec. 2, 2007) (unpublished).

Defendants bear the initial burden of producing evidence to preclude a prisoner from filing IFP, and this burden is satisfied by the existence of the three strikes against Plaintiff.  *See, e.g.,* <u>Brown v. City of Philadelphia</u>, Nos. 05–4160, 06–2496, 06–5408, 08–3369, 2009 WL 1011966, at *10 (E.D. Pa. Apr. 14, 2009) (unpublished).  Once that evidence is introduced, the burden shifts to Plaintiff to show that he is actually in imminent danger of serious physical harm.  *Id.*[32]

A prisoner's allegations must show that at the time he filed his complaint, he was in imminent danger of serious physical injury or faced an ongoing risk of serious physical injury.  *See* <u>Brown</u>, 387 F.3d at 1355 (in evaluating whether prison's failure to treat inmate with HIV placed him in imminent danger of serious injury, looking to the whole of his complaint and finding imminent danger of serious physical injury, where mistreatment exposed prisoner to the "alleged danger of more serious afflictions" in the future); *see also* <u>Andrews v. Cervantes</u>, 493 F.3d 1047, 1056 (9th Cir. 2007) ("Andrews II ") (stating, by example, that "a prisoner who alleges that prison officials continue with a practice that has injured him or others similarly situated in the past" satisfies the ongoing danger standard); *see also, e.g.*, <u>Smith</u>, 465 F. App'x at 837 (prisoner's allegations showed

---

[32] In this instance the court took judicial notice of Plaintiff's status as a three-striker (*see* eh. (day 1) at 3), and thus the FDOC was not required to produce evidence in this regard.

an "imminent danger of serious physical injury" at the time of filing of his § 1983 complaint and thereafter, where prisoner alleged he was punched in the stomach by one correctional officer, and in a subsequent pleading filed six months later, alleged that the same officer repeatedly threatened him with more severe violence than the earlier punch).

A prisoner's allegation that he faced imminent danger sometime in the past is an insufficient basis to allow him to proceed IFP pursuant to the imminent danger exception to the statute. *See* Medberry v. Butler, 185 F. 3d 1190, 1193 (11th Cir. 1999).

Here, Plaintiff has made wide-ranging and numerous allegations that suggest he is under imminent danger, which can be characterized as falling under the following four areas: (1) the denial of medical care; (2) the denial of food; (3) physical abuse at the hands of prison officials; and (4) physical abuse at the hands of inmates. Plaintiff has failed to satisfy his burden of showing that when he commenced this case on February 26, 2014, he was in imminent danger of serious physical harm or faced an ongoing risk of serious physical injury with respect to any of the four areas. As a general matter, the court carefully observed each witness as he or she testified at the evidentiary hearing. Among other factors, the court noted each witness's demeanor, manner and tone of voice on the stand, recollection of the incidents about which he or she testified, the witness's motive for testifying, if any, and the extent to which, if at all, the witness's testimony was either supported or contradicted by other evidence in the record. After having done so, the court, for the reasons articulated below, finds that the testimony of Plaintiff's witnesses, including Plaintiff himself, was unreliable, belied by other evidence of record, and likely crafted by Plaintiff for the purpose of furthering this litigation. On the contrary, the testimony by the FDOC's witnesses was not only reliable, but also much of it was corroborated by documentary evidence.

Denial of Medical Care

The evidence establishes that Plaintiff received medical care on multiple occasions throughout the time frame relevant to the issue before the court. The evidence also shows, that although Plaintiff did not receive medical care on some occasions, he did not receive that care because he refused it.

In brief, the evidence establishes that Plaintiff received medical care on at least the following occasions: November 12, 15, and 25, 2013; December 16, 2013; January 7, 21, and 27, 2014; March

24, 2014; and April 23, 2014.  It further shows that Plaintiff refused an initial physical evaluation on October 21, 2013, as well as checks of his vital signs on October 19, 2013, October 20, 2013, and November 13, 2013.  He also refused treatment, and even the most basic medical care, on November 18, 2013, and he subsequently refused treatment on March 26, 2014, and May 1, 2014.

This evidence thus refutes Plaintiff's uncorroborated allegations regarding the denial of medical care, including those in the complaint that he: (1) had no medical attention between October 16, 2013 and December 7, 2013; (2) was not allowed to receive any medical treatment after his transfer to the C.M.S.H.U. on December 11, 2013, after being beaten and/or gassed; (3) was denied all medical attention between December 20, 2013 and February 27, 2014, during the 7:00 a.m. shift to 5:00 p.m. shift (treatment records from Plaintiff's January 7 and 21, sick call visits reflect that he was seen at 9:00 a.m. on both occasions (*see* FDOC exh. 5 at B134, B133)); and (4) was denied any medical care after the ICT meeting, and after being palm punched, in March 2014.  It likewise refutes Plaintiff's testimony at the telephonic conference of May 15, 2014, that he had been trying to get to medical because he was in pain and had been injured, but was unable to do so.

The evidence further establishes that prior to Plaintiff's visit with Dr. Schwartz on May 16, 2014, he complained only of minor and easily-treatable conditions—gas pains and itchy skin—for which he was provided medications and advised he could return for follow-up care.  Although Plaintiff did not receive a "medical exploratory x-ray test to learn what has ruptured inside him," as he alleges, no such test was necessary based on the minor nature of Plaintiff's complaints to medical staff.  Put simply, Plaintiff did not report that he had incurred any serious injuries, such as those he has alleged in the complaint—including torn tendons, broken toe, "spranged" neck and knee joints, swollen ribs, "suffocation," cuts, bleeding from his anus, and internal injuries—and thus failed to put SRCI medical staff on notice of any need for a referral to a physician or outside hospital, exploratory testing, or any other form of more intensive treatment.  Further, the record establishes that Plaintiff had (and has) no need for such a referral because he had (and has) no such serious injuries.

<u>Deprivation of Food</u>

Although Plaintiff testified he was denied multiple meals on multiple occasions for a period of more than two months, and that some such denials were allegedly for days in a row, his own

witnesses contradicted his allegations.  At best, the testimony of Plaintiff's witnesses—if fully credited—establishes that Plaintiff was sporadically deprived of a meal and once provided only one meal on four consecutive days.  But such deprivations do not establish that Plaintiff was in imminent danger or suffered any physical injury.  What is more, the evidence of record compels the conclusion that Plaintiff was <u>not</u> in danger, as his medical records show that he gained <u>eighteen pounds</u> between the day he arrived at SRCI in October 2013, at which time he weighed 116 pounds, and May 2014, at which time he weighed 134 pounds (*see* exh. 5 at B54; exh. 7 at C8)).  Thus, there is no support whatsoever for Plaintiff's sworn statements that he was consistently denied meals and "starved" by SRCI staff.  And, as with Plaintiff's claims of denial of medical care, the evidence actually refutes his claims.

### Uses of Force by SRCI Staff

- Gassings
- Rapid Response Riot Team or Cell Extraction Team
- Use of Beanbag Shot

It is quite clear that numerous checks and balances are in place to ensure that correctional officers cannot use force without reporting it.  Thus, the lack of any corroborating documentation <u>whatsoever</u>—such as arsenal records, use-of-force reports, medical records documenting Plaintiff's injuries, ER forms, or FDOC records in Tallahassee—alone belies Plaintiff's allegations that SRCI officials have gassed him three times, deployed the RRRT or cell extraction team twice, and shot him with a beanbag (without even considering the credible testimony of the FDOC's witnesses who denied that any such uses of force occurred).  The court is left with only one conclusion, namely, that Plaintiff has repeatedly lied.  Thus, because <u>none</u> of these acts occurred, Plaintiff is not and was not in danger of imminent bodily harm due to SRCI officers' use of chemical agents, riot teams, cell extraction teams, or weapons.

### Beatings or Physical Abuse by Officers

Plaintiff has no witnesses to support his allegations that he was palm punched by Ofc. Kasanovich or body slammed by Ofc. Hall.  Moreover, both of the accused officers credibly testified that they had done no such thing.  Additionally, with respect to the former allegation, Ofc. Kasanovich testified he could not have done as Plaintiff claims because neither he nor any other

officer had access to the ER Specialist room.  Further, Dr. Schwartz saw no evidence of a broken tooth, much less evidence of "70%" of tooth having been broken, or a cut jaw, both of which allegedly resulted from Ofc. Kasanovich's palm punch.  The latter alleged incident was fully investigated by Inspector Radford, and he found no evidence to corroborate Plaintiff's allegations that Ofc. Hall body slammed him (or his claim that he had been shot with a beanbag, the other "primary issue" of which Plaintiff complained to Radford), and he closed the inquiry.

Likewise, Plaintiff's claim that his hand was slammed in the cell door flap and injured on May 1, 2014, is contradicted by the testimony of two of his own witnesses (i.e., Inmates Claude and Clay) and, of course, there is no medical evidence corroborating the claim.  Of more import, however, Plaintiff's allegation is wholly contradicted by the testimony of Inspector Radford, who was an eyewitness to Plaintiff's removal from the cell and knows without a doubt that Plaintiff's claim is untrue.

Finally, though Plaintiff alleges that the abuse and beatings resulted in serious bodily injury, Dr. Schwartz's examination and testing refute these allegations (as does the lack of any visible injuries to Plaintiff during his multiple visits to the medical department).  Dr. Schwartz credibly testified that Plaintiff had no blood in his stool or any serious medical issue or injury, much less an injury consistent with his allegations of ongoing beatings and significant internal injuries or injuries to his elbow or hand, and his observations are consistent with those of the SRCI nurses who treated Plaintiff during the relevant time frame.

<u>Beatings by Other Inmates</u>

Initially, Plaintiff's allegations—that Inmate Flowers and Jenrette beat him for one hour or more on December 11, 12, 13, 14, 16, 17, 18, 19, and 20, 2013—are on their face highly questionable, as it would be virtually impossible for such conduct to occur in a close management dorm by two close management inmates on nine separate occasions.  Additionally, although Inmate Flowers was a CM inmate housed with Plaintiff during that time period, he testified he never beat or harmed Plaintiff, and Plaintiff's medical records document no injuries or complaints relating to the alleged beatings.  Moreover, as the ICT participants concluded, Inmate Jenrette simply could not have acted as Plaintiff alleges, as he was never housed with Plaintiff.

Based on the foregoing, it is overwhelmingly clear that Plaintiff is not, and was not at the time he commenced this action, under imminent danger of serious physical injury, and he is at no risk of mistreatment or serious afflictions in the future. *See, e.g.*, Taylor v. Watkins, 623 F.3d 483 (7th Cir. 2010) (affirming district court's denial of three-striker plaintiff's motion to proceed IFP where evidence adduced at evidentiary hearing failed to show that plaintiff was in imminent danger of serious physical injury, where plaintiff's claim was based solely on his fear of being assaulted by two particular officers, and he alleged these officers assaulted him on five specific dates, but there was no medical evidence of any of the alleged assaults); Abdul-Akbar v. McKelvie, 239 F.3d 307, 315 n.1 (3d Cir. 2001) (expressing doubt that plaintiff's allegations sufficed to establish ongoing danger, where it was evident that plaintiff's allegations centered on an incident that occurred on or about January 9, 1998, when an officer allegedly sprayed plaintiff with pepper spray; plaintiff did not identify any further incidents occurring after that date; although plaintiff alleged he experienced several other acts of physical harassment by different officers, these events pre-dated the January 9 incident, and appeared entirely unconnected to it; while plaintiff alleged officers engaged in "continuing harassment, ploits [sic] to hurt or kill [him], and other forms of retaliation," such generalized allegations were insufficient to connect the specific separate incidents into a pattern of threats of serious physical injury that were ongoing); Springer, 2014 WL at 773505 (concluding, following evidentiary hearing on three-striker plaintiff's allegations of imminent danger, that the failure to provide plaintiff with proper medication to treat his skin ailment had not created an imminent danger of serious physical injury (plaintiff stated at evidentiary hearing that skin condition was painful and cause his skin to become "really red" and burn, but he admitted he had not requested to see a doctor in the four months preceding the hearing), the failure to transfer plaintiff to residential mental health treatment had not created an imminent danger of serious physical injury (plaintiff admitted at evidentiary hearing that his mental health conditions were stabilized and well-controlled on his current medication regimen, and he saw a qualified mental health professional once a month), and the failure to deliver plaintiff's outgoing mail had not created an imminent danger of serious physical injury); Willink, 2013 WL at 1501035, 1500699 (concluding, following evidentiary hearing on three-striker plaintiff's allegations of imminent danger, that plaintiff was not in imminent danger of serious physical injury where evidence showed that his claims were thoroughly

investigated by prison officials and determined to lack foundation); Tafari, 2012 WL at 5381235 (concluding, following evidentiary hearing on three-striker plaintiff's allegations of imminent danger, that plaintiff's claims of imminent danger of serious physical injury were incredible, where plaintiff claimed he was denied medical treatment and was assaulted or threatened with assault by correctional staff on thirty-seven different occasions over a three-year period, but plaintiff failed to produce a scintilla of credible evidence that corroborated any of his allegations and instead, manufactured his testimony and that of his witnesses, in an attempt to further his litigation; moreover, when faced with incontrovertible evidence that disproved his claims, plaintiff simply changed his story or offered additional details; and defendants produced volumes of records that either discredited or disproved plaintiff's complaints); Tierney, 2012 WL at 4502935 (concluding, following evidentiary hearing on three-striker plaintiff's allegations of imminent danger based upon plaintiff's allegation that he was in extreme pain, his mouth was infected, and institutional doctor was refusing to provide him with adequate dental care by failing to fix his teeth, that plaintiff failed to make a plausible allegation that he was facing an imminent danger of serious physical injury when he filed this action; and further finding that plaintiff made his allegations in bad faith, was fully aware he could alleviate his pain at any time by following doctor's recommendation of tooth extraction but refused extraction, and that doctor was not responsible for plaintiff's pain); Smith v. Wang, Nos. 7:09cv97, 7:09cv462, 2011 WL 322828 (W.D. Va. Jan. 10, 2011) (unpublished) (concluding, following evidentiary hearing on three-striker plaintiff's allegations of imminent danger based upon plaintiff's allegation that correctional personnel failed to provide him surgery to correct inguinal hernia, failed to prescribe pain medication for his hernia, discontinued vitamin B12 injections which had been prescribed by medical personnel at another correctional facility, failed to assign him to a bottom bunk (thereby aggravating his back pain), failed to inform him that he had tested positive for Hepatitis C, intentionally failed to provide adequate medical care for his Hepatitis C, unreasonably delayed medical treatment for his Hepatitis C, and intentionally failed to provide adequate medical care for acute edema, where medical evidence showed that medical personnel's responses to plaintiff's medical conditions did not pose an imminent danger of serious physical injury), *Report and Recommendation Adopted by* 2011 WL 322826 (W.D. Va. Jan. 31, 2011), *aff'd*, 452 F. App'x 292 (4th Cir. 2011) (unpublished).

V.    RECOMMENDATION THAT THIS ACTION BE REFERRED TO THE UNITED STATES ATTORNEY'S OFFICE FOR THE NORTHERN DISTRICT OF FLORIDA FOR CONSIDERATION OF PURSING PERJURY CHARGES AGAINST PLAINTIFF

As the district court is well aware, in this district all prisoner and non-prisoner pro se civil actions of any sort, including prisoner civil rights cases, and all habeas proceedings, are referred to the full-time magistrate judges for all proceedings, including preliminary orders, the conduct of necessary evidentiary hearings, and filing of reports and recommendations containing proposed findings of fact and conclusions of law and recommending disposition of the applications or petitions, in addition to numerous other matters that are assigned or referred to the magistrate judges. Thus, a large number of prisoner (and other) cases await the undersigned's review, some which are much older than the instant case, some with serious allegations that deserve attention, and all of which are important to the incarcerated litigants who brought them.  Absent an unusual circumstance, the undersigned generally processes the voluminous number of cases in the order in which they were filed.  Here, however, Plaintiff's case jumped to the front of the line and, as can now be seen, it should not have.

When Plaintiff initiated this action, the undersigned was troubled by his allegations and acted expeditiously to address them.  Thus, his case "trumped" most other pending cases, as the undersigned feared that Plaintiff truly was in danger and—at least potentially—that some sort of misconduct by prison officials was occurring at SRCI.  Thus, in short order, the undersigned directed the FDOC to respond to Plaintiff's allegations and thereafter conducted a telephonic conference and scheduled and conducted a two-day evidentiary hearing.  The amount of effort involved in these endeavors cannot be overstated.  Such efforts included planning for and implementing extensive security measures at SRCI to ensure the safety of the undersigned and her staff; arranging for multiple CM inmates to testify at the hearing; coordinating the appearance of multiple members of the SRCI correctional staff and medical staff; finding a location for the hearing that would accommodate the court's needs and those of the prison and ensure the safety of the numerous participants and witnesses; and the FDOC's preparing and duplicating multiple exhibits, some of which are voluminous, and deposing multiple prisoner witnesses prior to the evidentiary hearing.

In addition to these extensive efforts, the hearing itself involved numerous individuals who were taken away from their normal duties.  First, in addition to the nine SRCI staff witnesses who testified for the FDOC, multiple other SRCI staff members were on standby for the duration of the hearing in the event the court or FDOC determined their testimony was necessary.  Additionally, the FDOC was represented by two lawyers, who were assisted by a paralegal, and all three traveled from Tallahassee to Milton, Florida, for the two-day hearing.  The FDOC's medical staff witnesses, who are actually employed by Corizon Health, Inc., and not SRCI, were represented by an attorney, Greg Toomey, who traveled from Fort Myers to attend the hearing.   And from this court, the undersigned, a law clerk, a deputy clerk of court, a court reporter, and two deputy United States Marshals traveled to SRCI and were away from their duty stations or offices/courthouse for two full days.  Moreover, in addition to the extensive amount of labor and time expended by all of the persons involved, significant financial expenditures were also incurred.  Though the actual costs of the evidentiary hearing are not available, given the number of people involved and the length of the hearing, there can be no doubt they were extensive.

With this backdrop in mind, the undersigned was <u>astonished</u> to discover during the evidentiary hearing that not one shred of evidence supported Plaintiff's allegations of imminent danger.  The undersigned expected, for example, the evidence to show that SRCI officers had used some type of force against Plaintiff, and that the issue would be whether the force was justified and performed according to protocol.  As the hearing went into its second day, however, it became more and more apparent that Plaintiff was not in danger and that his allegations of imminent danger were fabricated.  This is why, in the midst of RN Allen's testimony, the undersigned sternly warned Plaintiff of the consequences of committing perjury.

The warning, though, had no effect on Plaintiff.  Undaunted, he persisted in committing a fraud upon this court, and his conduct should not go unpunished.  He has a pattern of making shocking allegations, which have resulted in the needless expenditure of scarce resources of the federal judiciary and the FDOC.  The only real danger that exists is the danger Plaintiff presents to himself—physically, by engaging in self-harm behaviors or refusing mental health services and medical treatment—and to the court, by manipulating the system and filing allegations that the court cannot ignore, such that his case undeservedly jumps above others that have waited longer for this

court's review and attention. Plaintiff knows the "magic words"—i.e., those that are necessary to raise a concern that he is in danger, such that he can avoid the three-striker filing bar—but his words have become swords for him to use in his battle against the system. His conduct must be stopped,[33] because "[f]rivolous and vexatious law suits [such as his] threaten the availability of a well-functioning judiciary to all litigants." Miller v. Donald, 541 F.3d 1091, 1096 (11th Cir. 2008). Though the court likely cannot impose a blanket filing prohibition on this abusive litigant, *see id.* at 1097, it can—and should—act by referring this case to prosecuting authorities to consider whether to pursue perjury charges against Plaintiff. The court's failure to refer this case to the United States Attorney's Office will render meaningless the undersigned's direct warning to Plaintiff, and no lesser deterrence will be effective.

Finally, the undersigned notes that she would not make this recommendation if it was not clear that Plaintiff in fact submitted a complaint that is, in all important respects, false, and that he repeatedly testified untruthfully during both the telephonic conference and the evidentiary hearing. Plaintiff also presented false testimony of inmate witnesses, which testimony was obviously crafted by Plaintiff to further this litigation (e.g., Inmate Davis, who testified Plaintiff had been gassed <u>at least</u> four times and gassed with excessive amounts of chemical agents; Inmate Lee, who testified that on May 1, 2014, he heard Plaintiff's hand being injured in the cell door flap). Additionally, during the evidentiary hearing Plaintiff went so far as to allege that, among other witnesses, the following witness lied: (1) RN Allen, even though her medical records are consistent with her testimony (and she had no apparent motive to lie or, resultantly, jeopardize her freedom, career, and livelihood by committing perjury); (2) Dr. Schwartz, even though he had been employed at SRCI for only a few months before he examined Plaintiff, he had no apparent motive to testify falsely, his report is consistent with his testimony, and he referred Plaintiff for additional testing and would have ordered other testing had Plaintiff reported additional complaints as he claims; and (3) Inspector Radford—a long-term law enforcement officer with an impeccable record—despite the fact that

---

[33] Since the evidentiary hearing Plaintiff has continued to file documents in the instant case. In one, he indicated that he wishes to pursue yet another civil rights action against many, if not all, of the same SRCI officials, involving similar allegations and claims. In another, he seeks a medical examination by a physician who is not affiliated with Corizon and claims he has been denied medical care and has internal injuries as a result of being abused. *See, e.g.*, doc. 76.

Plaintiff's own statements during their recorded interview contradict Plaintiff's statements at the evidentiary hearing and, had Radford actually witnessed the things Plaintiff claims he witnessed, Radford would have violated Florida law, faced criminal charges, and lost his job by failing to act or report what he had seen.[34]  The undersigned, who has participated in or presided over more than a thousand hearings and trials in her career as a lawyer and judge, has never witnessed a more shocking disregard for the truth by a litigant and, correspondingly, a more shocking abuse of the judicial system.

V.    CONCLUSION

Because Plaintiff is a three-striker, and his allegations of imminent danger of serious physical injury are not supported by evidence, this case should be dismissed without prejudice to Plaintiff's reasserting his allegations in a complaint for which he pays the full $400.00 filing fee at the time of filing the complaint.

In light of the foregoing, it is respectfully **RECOMMENDED**:

1.    That this action be **DISMISSED without prejudice** because Plaintiff did not pay the filing fee at the time he initiated this case and Plaintiff is not entitled to be granted in forma pauperis status pursuant to 28 U.S.C. § 1915(g), and it is further **RECOMMENDED** that the order adopting this report and recommendation direct the Clerk of Court to note on the docket that this cause was dismissed pursuant to 28 U.S.C. § 1915(g).

2.    That all pending motions be **DENIED as moot**.

3.    That this matter be referred to the United States Attorney's Office for the Northern District of Florida, which office should be directed to consider whether to pursue perjury charges against Plaintiff.

At Pensacola, Florida this 28<u>th</u> day of July 2014.


/s/ *Elizabeth M. Timothy*                              
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

---

[34] It is thus evident that Plaintiff will accuse <u>anyone</u> of lying in order to further his misguided goals.

Case No.: 3:14cv105/MCR/EMT

## NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  **Any different deadline that may appear on the electronic docket is for the court's internal use only.**  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).